# Exhibit H.

## In The Matter Of:

*Centerior/Ashland   v.*
*ACME, et al.*

---

*Carl Stutzman*
*Vol. 1, August 9, 1995*

---

*Mehler & Hagestrom*
*Court Reporters*
*1750 Midland Building*
*Cleveland, OH  44115*
*(216) 621-4984   or   (800) 822-0650*

*Original File 950809cs.asc, 305 Pages*
*Min-U-Script® File ID: 2070922100*

## Word Index included with this Min-U-Script®

CONFIDENTIAL
INFORMATION
MS3-0248

**Page 199**

upper right [3] and upper left, there are two phone numbers [4] there. Do you see those numbers, the one in the [5] upper left says 341 hyphen –

[6] A: 3234?

[7] Q: Yeah. Do you recognize that number?

[8] A: Right.

[9] Q: What number is that?

[10] A: Huh?

[11] Q: Is that a number to the Huth Oil facility?

[12] A: Yeah, sure.

[13] Q: And there's another number in the right-hand [14] corner, 341-3235?

[15] A: Yes.

[16] Q: Do you recognize that number?

[17] A: Yep.

[18] Q: Was that a number for the Huth Oil facility?

[19] A: Yes.

[20] Q: Did the numbers change over the years that you [21] worked at the facility?

[22] A: No. They were always the same.

[23] Q: Those two numbers were always in place?

[24] A: Yeah.

[25] Q: Until it closed?

**Page 198**

[1] A: Yep.

[2] Q: And I believe you testified that some of the [3] pick-up drivers drove on routes; is that right?

[4] A: Right. Right.

[5] Q: Did customers also call in for pick-ups?

[6] A: Oh, sure. Yeah, they called in but then there [7] was, in a lot of cases, the drivers on these [8] routes had their deal set up where they knew, it [9] was really up to the drivers to try to get in [10] there and take them so they wouldn't have to [11] call up. I mean, you know, that they could just [12] sort of, that they'd pick up certain times to go [13] like say to Canton, certain times to go to [14] Youngstown and they'd have a book that they'd [15] mark off when you were there, the day you were [16] there and then they'd, they got to know how long [17] it took for these tanks to fill up.

[18] Q: Did you have a book like that?

[19] A: No. No, because I didn't pick up.

[20] Q: You delivered, primarily?

[21] A: I just delivered, right.

[22] Q: The drivers that kept the books, do you know if [23] they kept the books in the truck?

[24] A: Well, they did while they was there, yeah, they [25] did while they was there.

[1] Q: And what was done with the books at night, if [2] you know?

[3] A: At night?

[4] Q: Did they leave them in the truck?

[5] A: Oh, I don't know what they did with them.

[6] Q: Were the books ever stored in the offices?

[7] A: No. No. That was their personal, that was the [8] driver's personal, personal record. I mean [9] that's a record he kept. I don't, nobody, them [10] never did get anywhere, but they probably threw [11] them in the trash when they left the employment [12] as far as that goes, you know.

[13] Q: Were there people in the office at Huth Oil [14] facility that answered the telephones?

[15] A: George Huth and some of the ladies that are [16] mentioned here that were secretaries.

[17] Q: Were there any secretaries?

[18] A: And the mechanic in the garage, Sebesy, he'd [19] answer the telephone because he was in the [20] garage.

[21] Q: Other than Sebesy and some of the women that [22] you've mentioned, are there any names of people [23] who worked in the office at the Huth Oil [24] facility that answered the phone that you [25] haven't mentioned their name but you recall

**Page 200**

[1] their name?

[2] A: Well, I think we've pretty much brought up the [3] names that were involved in the office. I c'n't [4] know. I wasn't involved in the office. I just [5] knew these people were in there, so I –

[6] Q: You earlier – I'm sorry, did you have more to [7] say?

[8] A: No. Go ahead.

[9] Q: Earlier you mentioned a woman by the name of [10] Julia Kaufman?

[11] A: Yes.

[12] Q: An accountant?

[13] A: Right. Right.

[14] Q: And she work in the office?

[15] A: No, she didn't. She was an accountant. She [16] just came in certain times to, you know; maybe [17] she made out. I don't even know exactly what [18] she, she probably made out the billings and that [19] kind of thing. I can't, but she was the [20] accountant.

[21] Q: During the time that you worked for Huth, are [22] you aware of any other accountants who did work [23] for Huth Oil?

[24] A: There was a man by the name of

Ewing and I think [25] we brought him up once. Ewing was an accountant

**Page 201**

[1] and they had some accountants after that and I [2] never did really hear. I heard these people's [3] names mentioned because they were with them the [4] longest and just Julia and Ewing, and that name [5] I wouldn't have remembered if you hadn't have [6] mentioned the name.

[7] Q: In terms of deliveries that were made to the [8] Huth Oil site, were those deliveries made just [9] during the day or were they made 24 hours a day?

[10] A: Well, hopefully they were made during the day [11] because nobody was down at the plant to take [12] deliveries. I mean, hopefully they were made [13] during the day.

[14] Q: And what were the hours of operation of their [15] facility?

[16] A: Well, the facility there, you'd probably say [17] maybe from eight to five but it could go to six [18] or, you know, if something was coming in; but as [19] far as in the middle of the night, why, that [20] would be very rare. It would have to be some [21] kind of an exception of some kind.

[22] Q: Were there any drivers that had keys to the [23] facility where they could deliver?

[24] A: Everybody had, I mean all the drivers that [25] worked for Huth had keys to the facility.

**Page 202**

[1] Q: But to your knowledge, there weren't many [2] deliveries outside of the hours of eight to [3] five; is that accurate?

[4] A: That's right. That's right. I mean unless it [5] was a special thing. I mean –

[6] Q: What type of special thing?

[7] A: Well, unless somebody had something happen that [8] somebody had to come in, you know, like say [9] there was a truck picking some oil up somewhere [10] and he was going to get in there late at night [11] or something; but none of, see, none of us would [12] ever go in on something like that. It would [13] have to be somebody that lived up close, so I [14] would really have no knowledge of who it was or [15] when it ever happened or so forth. Like I say, [16] it was rare that anybody ever came down late at [17] night and took a delivery, let somebody come in.

[18] Q: Are you familiar with a company called Black & [19] Decker?

[20] A: Oh, yes.

[21] Q: Did Huth Oil Company have any business dealings [22] with Black & Decker that you're aware of?

[23] A: Well, I really, I wouldn't know

Mehler & Hagestrom    Min-U-Script    (26) Page 198 - Page 202

CONFIDENTIAL INFORMATION MS3-0251

VOL. 1, August 9, 1995
Case 1:04-cv-10662-DPW    Document 5-10    Filed 05/17/2004    Page 4 of 34
ACME, et al

Page 203

[1] like that. I don't know what, no, I [2] couldn't give any information on that [3] because I don't know anything about Black & Decker.

[4] Q: Are you familiar with any Black & [5] Decker facilities in Ohio?

[6] A: Well, there used to be one in Kent. I [7] don't know if it's still there yet.

[8] Q: How is it that you're familiar with the location [9] of that facility?

[10] A: Because I live right near Kent, nine miles from [11] Kent. I live in Aurora, nine miles from Kent [12] and I know people that work at Black & Decker, a [13] lot of people that work at Black & Decker.

[14] Q: Did you ever make any pick-ups on behalf of Huth [15] Oil from the Black & Decker facility in Kent?

[16] A: No, I never made any pick-ups from Black & [17] Decker for Huth Oil that I can remember.

[18] Q: Are you aware of any drivers for Huth Oil making [19] any pick-ups from the Black & Decker facility in [20] Kent?

[21] A: No.

[22] Q: Not familiar with any?

[23] A: No. Them would have been small, them would have [24] been a small pick-up and somebody with a small [25] tanker that might have, like I say, I don't know

Page 204

[1] exactly what kind of oil they'd have, Black & [2] Decker.

[3] Q: When you say it would have been a small pick-up, [4] what are you basing that on?

[5] A: I'm just basing it on they'd go in there for a [6] couple hundred gallons of oil or something, no [7] large amount, whatever it was. I don't know. [8] Maybe they had a garage for their vehicles or [9] something. I don't know. I don't re-[10] member. I don't remember that Black & Decker was [11] anything of any –

[12] Q: Is there some basis for your statement that they [13] would go in there and pick up a couple hundred [14] gallons of oil? What are you basing that on?

[15] MS. HWANG: Objection.

[16] A: I'm just basing it on that you're talking about [17] picking up oil and the Black & Decker. I don't [18] know any more about it than you do about any-[19] body going in there and picking it up, but I'm [20] saying that they could, like we went in and picked [21] up oil. If somebody had oil, we went in and picked [22] it up; and if Black & Decker had some oil, they [23] called in and wanted their oil picked up, why, [24] they'd go in and pick

Page 205

[1] it up, but it would be one [25] of the people that was picking up out in that [1] area.

[2] Q: I understand. What I'm trying to ask you is [3] whether or not you have any knowledge of whether [4] or not that occurred.

[5] A: No.

[6] Q: I understand it could occur.

[7] A: I don't have any.

[8] Q: You don't have any knowledge?

[9] A: No, I don't have.

[10] Q: Do you recall ever telling an investigator that [11] you had knowledge of pick-ups by Huth employees [12] from the Black & Decker facility?

[13] MS. HWANG: Objection.

[14] A: No, I don't because I couldn't remember it if I [15] did because it's been a couple of years since [16] any of them people have been around. They left [17] long sheets with me and they wanted me to fill [18] them out, these companies and I said forget it, [19] because that's not my thing, filling out [20] papers. I said forget it. It's just the way [21] things are. I've got a business of my own I'm [22] running and I'm busy all the time. I don't have [23] time for all of that.

[24] Q: Do you recall talking to an in-[25] vestigator in October of 1993?

Page 206

[1] A: No.

[2] Q: You don't recall that?

[3] A: I recall talking to a couple of investigators [4] but I sure couldn't tell you what year I talked [5] to them in.

[6] Q: Do you recall talking to any in-[7] vestigators about Black & Decker?

[8] A: No.

[9] Q: You don't recall ever talking to them about [10] that?

[11] A: No. No. Because I, they talked to me about a [12] lot of things and I can't remember anything [13] they talked to me about, really.

[14] MR. COHEN: Those are all the [15] questions I have about Black & Decker.

[16]

[17] CROSS-EXAMINATION OF CARL STUTZMAN

[18] BY MS. HWANG:

[19] Q: Sir, Mr. Stutzman, my name is Mary Hwang on [20] behalf of Black & Decker. When you were [21] interviewed by a couple of these people years [22] ago, do you know if your statements were [23] recorded or, by a tape recorder?

[24] A: If they were recorded by a tape recorder, I [25] didn't know about it because they came out home,

Page 207

[1] out there at home.

[2] Q: Did they show you any documents or were they [3] referring to anything when they were meeting [4] with you; do you recall?

[5] A: Well, yeah, they had sheets like this with [6] different names and that of different companies [7] and so on, yeah.

[8] Q: Did any of those sheets have dates and pick-up [9] information on them already?

[10] A: I wouldn't know because they'd just go down the [11] line and ask me if I knew them just like we're [12] doing here. That's just the way the [13] conversation went.

[14] Q: Do you remember the name of these people?

[15] A: No. I remember one of them was from Boston and [16] I remember the first ones was from, it seemed [17] like they was from Chicago. Seemed like I had a [18] couple times there was people from Boston.

[19] Q: Sir, I take it from your earlier testimony, [20] then, that you have no personal knowledge and [21] information with regard to any pick-ups by Huth [22] Oil from a Black & Decker location?

[23] A: No.

[24] Q: Is that correct?

[25] A: No, that's right.

Page 208

[1] Q: Now, you did, and you don't have any knowledge [2] with regard to any calls by Black & Decker for a [3] pick-up at their plant; is that correct?

[4] A: No. Well, I didn't take calls.

[5] Q: So you don't have any knowledge about any call; [6] is that correct?

[7] A: No.

[8] Q: Yes, is that correct?

[9] A: Right.

[10] Q: Now, what about the location of the plant, you [11] say it's in Canton; where specifically, do you [12] recall the street location where it was?

[13] A: No.

[14] Q: You don't recall the street?

[15] A: No. I could, I sort of know what area it's in. [16] It's out toward Brady Lake, I think it was. I [17] don't even know if it's there anymore, but there [18] used to be a Black & Decker plant in Kent but I [19] don't –

[20] Q: How do you know for sure it was a Black & Decker [21] plant?

[22] A: Because there was people that I knew used to [23] work there, that worked there.

[24] Q: How long was this plant in ex-

XXXIII-071

CONFIDENTIAL
INFORMATION
MS3-0252

Page 211

[1] A: No.

[2] Q: – in the amount of $300?

[3] A: No.

[4] Q: Besides the fuel oil that you were talking about [5] earlier that was cleaned and then resold by [6] Huth, were there any other services or goods [7] that were being provided by Huth Oil that [8] people, customers would buy?

[9] A: No, no, not really, not unless somebody had a [10] tank, like I say if the tank was leaking or [11] some, even maybe a small tank where they'd [12] charge them by the hour to go out and pump the [13] tank out so they could clean it out or something [14] like that, then they'd charge them by the hour.

[15] Q: Could Black & Decker, for instance, have been [16] buying some product from Huth Oil, to your [17] knowledge?

[18] A: No. I wouldn't know what it would be.

[19] Q: You wouldn't know?

[20] A: They wouldn't burn – no.

[21] MS. HWANG: No further questions.

[22] Thank you.

[23] A: Unless it would be a road oil job, maybe, unless [24] they might have oiled their parking lot or [25] something like that.

Page 212

[1] MR. DOWNS: Unless anybody has any [2] objection, Rob has two more clients, two [3] tier ones and then he can get out of here. [4] Does anyone have any objection to his going [5] forward on those two? They are Bendix and [6] Westinghouse.

[8] DIRECT EXAMINATION OF CARL STUTZMAN

[9] BY MR. COHEN:

[10] Q: I'll start with Bendix.

[11] MR. Stutzman, have you ever heard of Bendix [12] Corporation?

[13] A: Oh, yes. Heard of them.

[14] Q: Are you familiar with any Bendix facilities in [15] Ohio?

[16] A: Not, no. I couldn't, not right off because I've [17] never really been at any of the facilities, but [18] that's a familiar name.

[19] Q: Are you aware of the existence of a Bendix [20] facility in Elyria, Ohio?

[21] A: Yeah. I can't. I think Pete Belak used to pick [22] up up there, uh-huh.

[23] Q: Do you know what Pete Belak picked up from the [24] Elyria Bendix facility?

[25] A: No, I really don't. I really don't know what he

Page 213

[1] picked up there. I think it was probably [2] lighter oils.

[3] Q: And when you refer to lighter oils, are you [4] referring to lighter gravity oils?

[5] A: Yeah. I can't. I think so. I don't know [6] because I've never. I never really had anything [7] to do with that.

[8] Q: What makes you think that he would have picked [9] up lighter oils from the Bendix Elyria facility?

[10] A: I think Bendix is sort of like a, they do a lot [11] of hydraulics and that kind of thing. I think [12] maybe they wouldn't have. I don't think, unless [13] they had motor oil up there, I'm just not sure [14] what they did up there. I never had anything to [15] do with Elyria, but I do know that, I do know [16] that Pete used to go up there sometimes.

[17] Q: Did you ever talk to Pete Belak about any [18] business he had with the Bendix facility in [19] Elyria?

[20] A: No.

[21] Q: Never did?

[22] A: Hu-huh. Just when we would maybe mention it [23] sometime. I never really had any real [24] discussion about anything.

Page 214

[1] (Interruption.)

[3] Q: Other than the facility in Elyria, are you [4] familiar with any other Bendix facilities in [5] Ohio?

[6] A: No, not really. Where are there some others? I [7] never –

[8] Q: I'm just trying to find out if you're familiar [9] with any others to follow up with questions [10] about Huth Oil's business?

[11] A: No, nope.

[12] Q: When you say that Pete Belak went up to the [13] Bendix facility at Elyria, is it your [14] understanding that he went there in connection [15] with his job with Huth Oil?

[16] A: Oh, yes. Yeah. He picked up. Pete picked up [17] in Elyria, Sandusky and up in that area. He [18] also –

[19] Q: And what type of vehicle did Pete pick up in?

[20] A: He had a 2,000-gallon tank pick-up truck or [21] 1,800 gallon. Toward the end there, he had a [22] 2,000, I think. He picked up all the stations [23] up in Elyria and up towards Sandusky and points [24] between.

[25] Q: Are you aware of any other drivers from Huth Oil

Page 215

[1] making any pick-ups at Bendix's Elyria facility?

[2] A: Oh, sure, there was other drivers up

Page 209

[1] like I say, I haven't heard, currently I haven't [2] heard anybody talk about it. I get the Evening [3] Record, the Ravenna Courier and I haven't read [4] anything about Black & Decker for some years [5] now.

[6] Q: And you recall that it was in the Canton, Ohio [7] area? Is that what you said earlier?

[8] A: No. Kent.

[9] Q: Kent?

[10] A: Yes. Kent, Ohio. Yeah.

[11] Q: And you've never been to that plant, though; is [12] that correct?

[13] A: No.

[14] Q: And you don't know the street, the location?

[15] A: No.

[16] Q: So I take it that you don't know any of the [17] contact people within Black & Decker or people [18] that Huth Oil may have been dealing with; is [19] that correct?

[20] A: Right.

[21] Q: And you have no information with regard to the [22] waste, type or quantity of materials that [23] allegedly were picked up at Black & Decker; is [24] that correct?

[25] A: No, I sure don't.

Page 210

[1] Q: And you don't even know the years of operation [2] when Black & Decker existed, if it did at all?

[3] A: No.

[4] Q: Sir, I'm not going to introduce this as an [5] exhibit, but I'd like you to take a look at a [6] document I have.

[7] MR. COHEN: Why don't we just mark [8] it. Do you mind marking it?

[9] MS. HWANG: No, if you want to [10] mark it as Exhibit 7.

[12] (Thereupon, Carl Stutzman [13] Deposition Exhibit 7, one-page ledger sheet, was [14] marked for purposes of identification.)

[16] Q: Marked as Exhibit 7 is a page from a receipt [17] ledger book that appears to reference 1970.

[18] Have you ever seen such a document or a [19] receipt ledger such as this?

[20] A: No.

[21] Q: It appears to suggest that Black & Decker [22] received a credit of $300 sometime around [23] January 20th of 1970. Do you have any [24] understanding as to why Black & Decker would be [25] paying money to Huth Oil –

[25] A: I don't know. That was years ago. I haven't.

CONFIDENTIAL
INFORMATION
MS3-0253

XXXIII-072



CONFIDENTIAL
INFORMATION
MS3-0254

XXXIII-073

# Exhibit I.

## In The Matter Of:

*Centerior/Ashland   v.*
*ACME, et al.*

---

*Richard Stutzman*
*Vol. 1, September 12, 1995*

---

*Mehler & Hagestrom*
*Court Reporters*
*1750 Midland Building*
*Cleveland, OH  44115*
*(216) 621-4984   or   (800) 822-0650*

Original File 950912rs.asc, 251 Pages
Min-U-Script® File ID: 4175518421

**Word Index included with this Min-U-Script®**

CONFIDENTIAL
INFORMATION
MS3-0256

Case 1:04-cv-10662-DPW    Document 5-10    Filed 05/17/2004    Page 9 of 34

they had a an [14] agreement that John Starr would pick up these [15] stations in that general area.

[16] Q: Now, when you would go to various dealer-owned [17] stations, whether they were Sohio stations or [18] any other stations, would the procedure be any [19] different than if you went to a Sohio [20] company-owned station?

[21] A: Different in the fact that I would pay cash [22] directly to the dealer people. And when it come [23] to the company stations, we would sign for it.

[24] Q: Okay. Do you know what happened to that [25] paperwork after the signing took place?

---

Page 22

[1] A: No. Absolutely not.

[2] Q: Do you know, do you have any knowledge of the, [3] how the accounting operation worked or accounts [4] receivable operation worked at the Huth office?

[5] A: No, I do not.

[6] Q: What would you do with the paperwork when you [7] returned to the site from the Sohio [8] company-owned stations?

[9] A: Take it to the office that was across the street [10] from our tank farm to Mr. Huth's office and put [11] it on his desk.

[12] Q: You mentioned picking up a light oil or kerosene [13] at NASA. Where is that facility located?

[14] A: At, right at the airport. At that time it was [15] right at Cleveland Hopkins Airport.

[16] Q: Now, can you - I'll wait a little bit on the [17] specifics of those. I want to get more into [18] some of the general questions first.

[19] Looking at the various tanks at the Huth [20] facility that are shown on Exhibits 1 and 2, can [21] you make an attempt to tell us what those [22] various tank· were used for? · ecifically, were [23] any of the tanks used for settling, for heat [24] treatment, for any other special functions?

[25] A: Yes. This 250 tank -

---

Page 23

[1] Q: On Exhibit 1.

[2] A: - was used as a settling tank. It actually had [3] a heat unit in it to heat the oil to make the [4] viscosity of the oil different and it settled [5] out and we had different pipe valve locations at [6] different heights that you would get a different [7] viscosity oil, the heavier stuff at the bottom, [8] the lighter stuff at the top.

[9] Q: Did you have the ability to remove the oil from [10] those various strata within the tank?

---

[11] A: Yes.

[12] Q: Were you ever involved in the delivery of oil?

[13] A: Yes. I, Carl, we made all of the fuel oil [14] deliveries. When Carl got behind, he would [15] instruct me to deliver to different sites. [16] Could have been – we had nurseries that they [17] delivered to and to asphalt plants that made [18] asphalt for roads.

[19] Q: Okay. Now, getting back to the, Exhibits 1 and [20] 2, can you tell us what any of those other tanks [21] were used for? You have described what 250 was [22] used for.

[23] A: Yes. Now, 125 was a, for crankcase. That was a [24] crankcase tank. 158 was a crankcase tank.

[25] Q: By crankcase oil, you mean oil you picked up

---

Page 24

[1] from service stations?

[2] A: From service stations, yes. And number 70 [3] really was a tank that you would pump a certain [4] amount of crankcase into and then you would pump [5] a certain amount of light solvent type oil that [6] you might get from NASA or whatever, that was [7] clean, and they would also pump kerosene into [8] that tank to mix to get a certain viscosity, to [9] what we called number 6 fuel oil for, that was [10] burnable in these asphalt gun type burners and [11] also nurseries for heating.

[12] Q: To your knowledge, did Huth ever purchase virgin [13] light oils, solvents, kerosene, et cetera, to [14] mix at the facility?

[15] A: Yes.

[16] Q: From whom did they make those purchases?

[17] A: All I know is that they were trucked in by [18] transport people in around the vicinity and I [19] did not know who was the supplier.

[20] Q: And where would those virgin oils, kerosene, et [21] cetera, be placed?

[22] A: That would come in and generally go into 70 [23] tank.

[24] Q: Okay. Do you know whether Huth ever purchased [25] asphalt, liquid asphalt? And by that I'm

---

Page 25

[1] talking about products that may have been [2] designated MC-3, MC-4, MC-5.

[3] A: No. He did not go into the MCs.

[4] Q: You don't have any recollection –

[5] A: No.

[6] Q: – of that?

[7] A: No.

[8] Q: Continue, if you would, with tanks.

---

If you [9] could tell us the purpose of any other tanks on [10] either Exhibit Number 1 or Exhibit Number 2 for [11] the use to which they were put.

[12] A: That seems to be all that I remember, looking at [13] this diagram.

[14] Q: Do you know whether there were any instances or [15] did you participate in any instances where waste [16] oil was taken directly from a generator to an [17] end user, namely waste oil that would be taken [18] from the person sending it to Huth and then [19] delivering it to someone else either for road [20] oiling or use as a heating oil or anything like [21] that without coming through the Huth facility?

[22] A: No. Never. It always came from our tank farm [23] and out. Whatever I ever picked up was brought [24] to the tank farm and put into one of those tanks [25] and whatever went out went out of one of those

---

Page 26

[1] tanks.

[2] Q: Now, do you know what percentage of the oil that [3] went out of the Huth facility went out as fuel [4] oil versus road oil or any other product?

[5] A: I would think that there probably was, more went [6] out as fuel oil. But it would be pretty close [7] because the road oil was strictly in the summer, [8] in the summer months, June, [9] July, August, and that was it. The fuel oil [10] operation was year round. So I would say that [11] the volume of fuel oil, in other words, I'm [12] talking about residual number 6 oil out was [13] probably greater than the road oil.

[14] Q: Do you know whether the Huth facility on East [15] 83rd Street was ever oiled itself? In other [16] words, was oil used there for dust control?

[17] A: We didn't have to because there was enough sort [18] of dragged around by truck wheels and all that [19] kind of thing that it was, it was never dusty.

[20] Q: Tell me about spills. Did you ever observe [21] spills of oil occurring at the facility?

[22] A: The greatest spill was when we had a fire. We [23] had lightning hit a tank and it spilled over the [24] complete area down into some houses and burnt [25] the houses and the maintenance garage.

---

Page 27

[1] Q: Do you recall that occurring around 1953?

[2] A: Yes.

[3] Q: What else do you recall about that fire and [4] spill?

[5] A: It required a great amount of clean-up and we [6] built a new maintenance garage and we started [7] almost im-

---

XXXIII-078

CONFIDENTIAL
INFORMATION
MS3-0259

Case 1:04-cv-10662-DPW    Document 5-10    Filed 05/17/2004    Page 10 of 34
ACME, et al.
Date, September 12, 1995

mediately to build a new maintenance [8] garage, which took a considerable amount of [9] time, and we built it ourselves. That was the [10] main thing that I remember about that.

[11] Q: Do you recall what was spilled at that time?

[12] A: That was a light, a light oil tank that went [13] up. It wasn't a crankcase tank. It was [14] solvents and that type of things, light oil.

[15] Q: Do you recall where that tank was located?

[16] A: That tank was directly above the maintenance [17] garage. It was right, right up in about this [18] area right here.

[19] Q: Pointing to an area above the building marked C [20] on Exhibit 1?

[21] A: Yes.

[22] Q: You're pointing into the area where –

[23] A: Just above the dikes.

[24] Q: – it says, 10B and 10A?

[25] A: Yes.

Page 28

[1] Q: On Exhibit 1?

[2] A: Yes.

[3] Q: Okay.

[4] MR. RINGSMUTH: That's where that [5] tank was?

[6] A: Yes. Just behind the maintenance garage, that's [7] C, and it was just over the dike, and that's [8] where the tank, where it sat.

[9] Q: So what spilled from that tank was something [10] fairly light?

[11] A: Yes.

[12] Q: Rather than crankcase oil?

[13] A: Yes.

[14] Q: Do you recall how much spilled from the tank?

[15] A: That thing ruptured and it, I don't know this to [16] be a fact, but I think it could have been 75,000 [17] gallons.

[18] Q: Do you know how much burned versus how much was [19] spilled across the site?

[20] A: It had to be a tremendous amount, because it [21] poured down and into some houses, into the row [22] of garages along East 83rd Street and burnt [23] everything out. Burnt all this out, burnt the [24] houses out, burnt this, burnt trucks, vehicles [25] and everything that was sitting down there.

Page 29

[1] Q: So is it fair to say that it was burning as it [2] was moving?

[3] A: This happened at night. When I arrived there, [4] the place was raw. There wasn't any fuel going [5] then. The

fire was out so there wasn't anything [6] draining down into the area then.

[7] Q: Were there any pockets of fuel that you could [8] see that had remained unburned?

[9] A: No, I don't recall. The ground was porous and [10] it probably dropped right down there.

[11] Q: What was involved in the clean-up?

[12] A: All we did was replaced, replaced buildings. We [13] replaced our maintenance garage and replaced [14] our – actually, that was all. All we did [15] was – of course, there was a lot of other [16] companies there and –

[17] Q: Let me – I'll get –

[18] A: All we were involved in was replacing our [19] maintenance garage.

[20] Q: I will get into the other companies in a [21] moment.

[22] Can you tell me whether any soil excavation [23] took place –

[24] A: None.

[25] Q: – after the spill?

Page 30

[1] A: No, absolutely none.

[2] Q: So whatever had sunk into the soil remained in [3] the soil?

[4] A: True.

[5] Q: Do you recall whether the tank from which the [6] spill occurred as a result of the fire was a [7] tank that contained product of Huth or was that [8] a tank that contained product belonging to some [9] entity other than Huth?

[10] A: Now that you bring that up, that tank very well [11] could have been used by one of the other [12] tenants.

[13] Q: Let me run th..ough some names with you and see [14] if this might refresh your recollection in any [15] way. And as I run through these names, I'll ask [16] you what you know abou'' their relationship to [17] the site and specifically whether these were [18] companies that may have stored any kind of [19] product on the Huth site.

[20] The first is J & E Oil.

[21] A: J & E had a fuel oil storage. They delivered to [22] small trailer camps and so on. And they had a [23] small tank there of fuel oil storage.

[24] Q: Do you know whether that tank contained fuel oil [25] or waste oil of some sort?

Page 31

[1] A: I – just fuel oil, fuel oil.

[2] Q: Number 1 or number 2 fuel oil?

[3] A: Yes.

[4] Q: Just household?

[5] A: Yes, household burning fuel oil.

[6] Q: Was this fuel oil that had been acquired from an [7] oil company?

[8] A: Yes.

[9] Q: And simply stored on the site?

[10] A: That's right.

[11] Q: How about Bronoco Solvents?

[12] A: Okay. They had their own storage tanks there.

[13] Q: Uh-huh. Do you know whether it was one of their [14] tanks that –

[15] A: Okay. That – see, that's almost 50 years ago, [16] so that brings back a recollection of the fact [17] that it was one of the other tenants with a very [18] light solvent or whatever it was.

[19] Q: Okay. But you don't know whether the tank [20] involved in the '53 fire was a Bronoco tank or [21] not?

[22] A: No, I could not say that.

[23] Q: But as I understand your testimony, you do know [24] that Bronoco stored solvents or light oil [25] products at the facility?

Page 32

[1] A: Yes, uh-huh.

[2] Q: Do you know of any spills occurring from tanks [3] operated by Bronoco?

[4] A: No.

[5] Q: Do you know of a company named Helper Paint [6] Removal?

[7] A: Yes.

[8] Q: And how do you know of them?

[9] A: They were in the building. There was a large [10] warehouse building that was below our tank farm [11] and paralleled, near 83rd Street and their [12] operation was pretty much inside the [13] warehouse.

[14] Q: Can you find that building on either Exhibits 1 [15] or 2? Keep in mind you have to turn Exhibit 2 [16] upside down in order to –

[17] A: It would be – East 83rd Street. It would be [18] this building right here.

[19] Q: So it would be the building on the top right of [20] Exhibit Number 2?

[21] A: Yes.

[22] Q: To the left of the words auto scrap yard and [23] it's a building with hatching through it. It [24] just says building and attached to it it had a [25] loading dock. Is that the building you are

Page 33

[1] referring to?

[2] A: Yes, uh-huh.

[3] Q: You're saying that's where Helper Paint Removal [4] was located?

[5] A: Yes.

[6] Q: Do you know what, if anything, they stored in [7] that building?

CONFIDENTIAL
INFORMATION
MS3-0260

# Exhibit J.

# EXPERT'S REPORT

**W.W. Cross Facility - Jaffrey, New Hampshire**
**Huth Oil Site - Cleveland, Ohio**
**J.C. Rhodes - New Bedford, Massachusetts**
**Former Whitman Metals Product Site - Whitman, Massachusetts**

*Liberty Mutual Insurance Company*
*v.*
*The Black & Decker Corporation, et al.*

**U.S.D.C., D. Mass., C.A. No. 96-10804-DPW**

**April 30, 1998**

*Prepared for:*

**Liberty Mutual Insurance Company**

*Prepared by:*

Peter J. Gerbasi, P.E.
Principal Engineer
**ROUX ASSOCIATES, INC.**
1377 Motor Parkway
Islandia, New York 11788

**ROUX**

# CONTENTS

1.0 INTRODUCTION ........................................................................... 1

2.0 W.W. CROSS SITE ....................................................................... 2

3.0 HUTH OIL SITE .......................................................................... 8

4.0 J.C. RHODES SITE ....................................................................... 11

5.0 FORMER WHITMAN METALS PRODUCT SITE ....................................... 15

# APPENDIX

A.  Professional Profile

## 1.0  INTRODUCTION

This Expert's Report regarding the following four sites:

- W.W. Cross Facility - Jaffrey, New Hampshire;

- Huth Oil Site - Cleveland, Ohio;

- J.C. Rhodes - New Bedford, Massachusetts;

- Former Whitman Metals Product Site - Whitman, Massachusetts;

was prepared by Peter J. Gerbasi, P.E., Principal Engineer, Roux Associates, Inc.  This report was prepared for the Liberty Mutual Insurance Company in *Liberty Mutual Insurance Company v. The Black & Decker Corporation, et al.*

Opinion reached in this report are based on the following:

- Reports, maps, correspondence, and other documents provided by Plaintiff's counsel;

- Publicly available reports, maps, aerial photographs and other documents; and

- Mr. Gerbasi's professional experience in engineering and the remediation of contaminated sites nationwide.

Mr. Gerbasi's opinions are provided in Sections 2.0., 3.0, 4.0 and 5.0.  Mr. Gerbasi's professional profile is provided in Appendix A.

## 2.0 W.W. CROSS SITE

**Opinion 1:  Environmental activities completed and/or proposed at the W.W. Cross Site, including excavation, removal, and disposal of sludge, backfilling, grading, and capping of the filter bed and tack pile, as well as ground-water monitoring, are preventative and are not designed to remediate environmental harm.**

**Bases for Opinion 1.**

- The Surface Impoundment Post-Closure Plan (after the removal activities) states "EPA took the position formally announced in the Federal Register on March 19, 1987, that a clean closure may only be achieved if the groundwater does not contain any hazardous constituents. Because analysis has shown groundwater and subsoil to contain detectable hazardous constituents at the W.W. Cross facility, the State directed Emhart to provide post-closure care required for "in-place closure" (i.e., closure as a landfill)."

- The Surface Impoundment Post-Closure Plan states "Due to the findings of the groundwater assessments, the State of New Hampshire (State) identified two principal concerns:  (1) the potential leaching of metals and cyanide from the sludge and eventually from the soils beneath the sludge, and (2) the presence of volatile organics in groundwater beneath the surface impoundment and extending downgradient towards Cheshire Pond."

- The Surface Impoundment Post-Closure Plan states "...a notation will be made on the deed to the facility property to notify potential purchasers of the property that (1) the surface impoundment was used for the disposal of hazardous waste, (2) use of the closed surface impoundment is restricted under 40 CFR 265 Subpart G (Closure and Post Closure) regulations, ...."

- The Filter Bed Closure Plan states "after removal of sludge and top layer of soil, less than 200 ppm of total cyanide will remain in a thin layer of soil; and

  - the release of hydrogen cyanide should not present a problem because:

  - the quantity of residual cyanide will be small since it will be confined to a thin layer of soil;

  - the site will be regraded and covered;

  - access to the site will be controlled by the existing fencing;

  - the atmospheric conditions are open and no gases would accumulate; and

  - cyanides remaining at the site will be destroyed by chemical and biological action, thus further reducing the concentrations of residual cyanide over time."

- The Filter Bed Closure Plan states "The primary purpose of the closure plan is to minimize any potential environmental impacts. Of concern to the State of New Hampshire is the potential for leaching of residual chemicals from the soil into the groundwater by infiltration of acidic precipitation through the cover."

- The New Hampshire Department of Environmental Services May 6, 1996 correspondence states "...we stated that the Department would consider alternative remedial goals based upon a demonstration that the wastes would have no increased risk to public health due to direct contact and present no other adverse environmental impacts." The correspondence further states that in the Laureiro 1995 submittal "No recommendation was made to remove the Tack Pile wastes and transport these wastes off-site to an appropriate waste disposal facility because of the large volume (6,500 cubic yards) of wastes....Instead, it was proposed to install an impermeable cap over the Tack Pile as the preferred remedial alternative."

- The Solid Waste Disposal Facility Criteria states "The operating criteria also contain a variety of landfill management requirements that are aimed at preventing potential environmental or public health problems. These provisions include restrictions on public access to the landfill, daily cover requirements to minimize disease vector and other problems, methane gas control to prevent gas explosions, controls on runoff from the facility to prevent releases to surface and ground water resources...." Furthermore, preventive measures for closure include a final cap designed to minimize leachate generation and migration, and for long-term care including to maintain and monitor the site for 30 years following closure (56 Federal Register, p. 50988).

## Opinion 1 References:

E.C. Jordan Co.; October 11, 1988. Surface Impoundment Post-Closure Plan for Emhart Corporation, Jaffrey, New Hampshire.

E.C. Jordan Co.; September 1984. Filter Bed Closure Plan for W.W. Cross Division of PCI Group, Inc.

New Hampshire Department of Environmental Services; May 6, 1996. Correspondence from James B. Zeppieri to Eileen D'Amico, Black and Decker Corporation regarding the Tack Pile.

## Opinion 2: No elements of the W.W. Cross Site remedies are associated with ground-water remediation.

## Bases for Opinion 2.

- The Surface Impoundment Post-Closure Plan states that monitoring activities will be conducted for groundwater, surface water, and the cover system. "Quarterly sampling will be reduced to semi-annual sampling for years two through thirty provided contaminant concentrations do not show a statistically significant increase.

- The New Hampshire Department of Environmental Services May 6, 1996 correspondence states "If Black and Decker would like to continue to pursue closure of the Tack Pile without treating the cyanide wastes then it will need to:  1) provide groundwater monitoring (under a Groundwater Management Permit),..."

- The LEA July 22, 1996 correspondence states "The objective of the proposed hydrogeologic investigation is to assess the impact of the tack pile (SWMU #2) at the W.W. Cross facility on groundwater quality."

**Opinion 2 References:**

E.C. Jordan Co.; October 11, 1988.  Surface Impoundment Post-Closure Plan for Emhart Corporation, Jaffrey, New Hampshire.

New Hampshire Department of Environmental Services; May 6, 1996.  Correspondence from James B. Zeppieri to Eileen D'Amico, Black and Decker Corporation regarding the Tack Pile.

Loureiro Engineering Associates, P.C.; July 22, 1996.  Correspondence from Gail L. Batchelder to James Zeppieri, New Hampshire Department of Environmental Services regarding Hydrogeologic Investigation.

**Opinion 3:  Environmental activities completed and/or proposed at the W.W. Cross Site, including excavation, removal, and disposal of sludge and contaminated soil, backfilling, grading, and capping of the filter bed and tack pile, as well as ground-water monitoring, are ordinary operational and closure requirements of surface impoundments and landfills.**

**Bases for Opinion 3.**

- The Proposed Hazardous Waste Rules (43 Federal Register 59012) states that upon final closure, all hazardous waste and hazardous waste residuals shall be removed from the surface impoundment.  (December 18, 1978).

- Subpart K (Surface Impoundments) of the Hazardous Waste Regulations (40 CFR Part 265.228) states "At closure the owner or operator may elect to remove from the impoundment: (1) Standing liquids; (2) Waste and waste residues; (3) The liner, if any; and (4) Underlying and surrounding contaminated soil."  The rule further states "If the owner or operator does not remove all the impoundment materials in paragraph (a) of this section, or does not make the demonstration in paragraph (b) of this section, he must close the impoundment and provide post-closure care as for a landfill under Subpart G..." (May 19, 1980).

- The 1974 USEPA Guidelines on Thermal Processing and Land Disposal of Solid Waste (40 CFR Part 241) provides recommended procedures for landfill operations.  These procedures include that final cover (not less than two feet) be applied on each area as it is completed.  It further states that access should be controlled by established roadways only, and records should be kept of qualitative and quantitative environmental impact using leachate and gas sampling and analyses, and ground-water and surface-water quality sampling and analyses upstream and downstream of the site.

- In May 1980, the USEPA promulgated Interim Status Standards for Owners and Operators of Hazardous Waste Treatment, Storage, and Disposal Facilities, Subpart N - Landfills (40 CFR Part 265.300) which provides closure and post-closure requirements.  Among these closure requirements are final cover placement, control of ground-water, surface-water, and air pollution migration as specified in the closure plan.  Post-closure care requirements include: maintenance of the function and integrity of the final cover; maintenance and monitoring of the leachate collection, removal, and treatment system; and the gas collection control system; and restriction of access to the landfill.

- The September 17, 1982 Project Summary states "Since the lagoon is currently regulated as a hazardous waste site and appears ineligible for delisting, the broad objective of this project is either to close the lagoon according to RCRA and State requirements, or else assure that continued operation of the lagoon will meet RCRA and State standards."

- The Emhart Corporation October 30, 1985 correspondence states "...it appears that hazardous waste discharges to the surface impoundment ceased no later than December 11, 1982."

- The Filter Bed Closure Plan states "The State has requested that closure of this site meet the requirements of the RCRA regulations for closure and post-closure.  Closure of the site would be accordingly governed by regulations promulgated by EPA under 40 CFR 265, Parts F, G, and K. .....The regulations require basically either 1) closure as a hazardous waste facility under stringent closure and post-closure requirements or 2) removal of all material classified as hazardous."

- The Filter Bed Closure Plan states "It has been previously agreed by Emhart that all sludge will be removed from the filter bed.  This action has been proposed since it is an acceptable alternative under RCRA closure regulations for surface impoundments and will effectively remove the primary source of potential contaminants."

- The Filter Bed Closure Plan states "Thus, the objective is to close the site as required by Part 265 in order to adequately protect the environment from the cyanide contamination found in the uppermost layer of soil."

- The Filter Bed Closure Plan states "Closure of the surface impoundment must be pursuant to State of New Hampshire (State) regulations....The principal requirements are found in 40 CFR Part 265, Subparts F (Groundwater Monitoring), G (Closure and Post-Closure), and K (Surface Impoundments).

- The Surface Impoundment Post-Closure Plan states "The closure activity was undertaken in two principal components: 1) excavation, removal, and disposal of sludge and contaminated soil, and 2) backfilling, grading, and capping of the filter bed."  These activities were completed on July 30, 1986.

- The Surface Impoundment Post-Closure Plan states "EPA took the position formally announced in the Federal Register on March 19, 1987, that a clean closure may only be achieved if the groundwater does not contain any hazardous constituents.  Because analysis has shown groundwater and subsoil to contain detectable hazardous constituents at the W.W. Cross facility, the State directed Emhart to provide post-closure care required for "in-place closure" (i.e., closure as a landfill)."  "In general, the State has directed that the post-closure care program meet the requirements of 40 CFR Part 265."

- The Surface Impoundment Post-Closure Plan states that the post-closure plan addresses groundwater, surface water and cover system monitoring; maintenance activities including erosion, cover system, settlement and subsidence; and additional post-closure activities such as post-closure notices, certification of post closure.

- The New Hampshire Department of Environmental Services May 6, 1996 correspondence states "If Black and Decker would like to continue to pursue closure of the Tack Pile without treating the cyanide wastes then it will need to:  1) provide groundwater monitoring (under a Groundwater Management Permit),  2) provide financial assurance for post-closure care, 3) demonstrate through the performance of an environmental and public health risk assessment that capping without further treatment would not pose any unacceptable environmental and public health risks 4)meet the Department's solid waste landfill closure requirements, and 5) perform on-site treatment of excavated cyanide wastes...,"  This correspondence further states "If closure as a solid waste landfill is determined by the Department to be the appropriate course of action, Black and Decker should proceed with the process of landfill closure."

- The LEA July 22, 1996 correspondence states "The proposed investigation will be performed as part of one of the activities required for closing the tack pile as a solid waste landfill in accordance with requirements of the State of New Hampshire for closure of such landfills and as described in the Guidance Document for the Closure of Solid Waste Landfills in New Hampshire..."

## Opinion 3 References:

Blatz, John B.; September 17, 1982.  Project Summary.

E.C. Jordan Co.; October 11, 1988.   Surface Impoundment Post-Closure Plan for Emhart Corporation, Jaffrey, New Hampshire.

E.C. Jordan Co.; September 1984.   Filter Bed Closure Plan for W.W. Cross Division of PCI Group, Inc.

Emhart Corporation; October 30, 1985.   Correspondence from John B. Blatz to Robin Lind, United States Environmental Protection Agency regarding Letter of Warning.

New Hampshire Department of Environmental Services; May 6, 1996.   Correspondence from James B. Zeppieri to Eileen D'Amico, Black and Decker Corporation regarding the Tack Pile.

Loureiro Engineering Associates, P.C.; July 22, 1996.   Correspondence from Gail L. Batchelder to James Zeppieri, New Hampshire Department of Environmental Services regarding Hydrogeologic Investigation.

## Opinion 4:   No elements of the W.W. Cross Site remedies are associated with off-site cleanup.

### Basis for Opinion 4.

- The Emhart Corporation October 30, 1985 correspondence states that a revised drawing showing facility boundaries and the location of all known SWMUs within the facility boundaries was provided.  Among the SWMUs listed were SWMU No. 2 and SWMU No. 3.   "SWMU No. 2 is a former waste pile measuring approximately 150 feet x 100 feet and 2-3 feet deep.  SWMU No. 3 is an inactive surface impoundment measuring approximately 150 feet x 100 feet, of varying depths...."

**Opinion 4 Reference:**

Emhart Corporation; October 30, 1985.  Correspondence from John B. Blatz to Robin Lind, United States Environmental Protection Agency regarding Letter of Warning.

## 3.0  HUTH OIL SITE

**Opinion 1:  Environmental activities completed and/or proposed at the Huth Oil Site, including securing the site, removing, storing, and disposing of free standing oils, dismantling tank equipment and installing a surface cover over the Site are preventative and are not designed to remediate environmental harm.**

**Bases for Opinion 1.**

- The Administrative Order states that Work Plan 1 shall require " a.  Secure the Site by repairing all gaps in the fence surrounding the Site.  b.  Remove and properly store or dispose of all free standing oil in dikes; repair cracked or slumping dikes surrounding all above ground tanks which contain any liquids, and take necessary measures to prevent the release of liquids from the oil/water separator, the lagoon, dikes, or tanks."

- The USEPA Preliminary Assessment states "Many of the tanks and tankers at the Facility are severely corroded and are inadequately supported.  Several of the tanks are not contained within diked walls.  The tanks with diked areas have no liner or collection system in place to prevent infiltration to surrounding soils.  These inadequacies could eventually lead to groundwater contamination if not remedied."

**Opinion 1 References:**

United States Environmental Protection Agency Region V; October 5, 1990.  Administrative Order

United State Environmental Protection Agency; September 5, 1990.  Potential Hazardous Waste Site Preliminary Assessment.

**Opinion 2:  No elements of the Huth Oil Site remedies are associated with ground-water remediation.**

**Basis for Opinion 2.**

- The USEPA Preliminary Assessment states "Many of the tanks and tankers at the Facility are severely corroded and are inadequately supported.  Several of the tanks are not contained within diked walls.  The tanks with diked areas have no liner or collection system in place to prevent infiltration to surrounding soils.  These inadequacies could eventually lead to groundwater contamination if not remedied."

**Opinion 2 Reference:**

United State Environmental Protection Agency; September 5, 1990.  Potential Hazardous Waste Site Preliminary Assessment.

**Opinion 3:**  **Environmental activities completed and/or proposed at the Huth Oil Site, including securing the Site, removing, storing and disposing of free standing oils, dismantling tank equipment, removing and disposing of soils and sludges contaminated with hazardous substances, and installing a surface cover  are ordinary operational and closure requirements of treatment, storage and disposal facilities.**

**Bases for Opinion 3.**

- Subpart J of the Hazardous Waste Regulations states "At closure of a tank system, the owner or operator must remove or decontaminate all waste residues, contaminated containment system components (liners, etc.), contaminated soils, and structures and equipment contaminated with waste, and manage them as hazardous waste..." (40 CFR Part 265.197)

- Subpart J of the Hazardous Waste Regulations states "A tank system or secondary containment system from which there has been a leak or spill, or which is unfit for use, must be removed from service immediately, and the owner or operator must satisfy the following requirements:  (a) Cessation of use: prevent flow or addition of waste......(b) Removal of waste from tank system or secondary containment system.....(c) Containment of visible releases to the environment....(d) Notifications, reports.....(e) Provision of secondary containment, repair, or closure...."

- The Proposed Hazardous Waste Rules (43 Federal Register 59012) states that upon final closure, all hazardous waste and hazardous waste residuals shall be removed from the surface impoundment.  (December 18, 1978).

- Subpart K (Surface Impoundments) of the Hazardous Waste Regulations (40 CFR Part 265.228) states "At closure the owner or operator may elect to remove from the impoundment: (1) Standing liquids; (2) Waste and waste residues; (3) The liner, if any; and (4) Underlying and surrounding contaminated soil."  The rule further states "If the owner or operator does not remove all the impoundment materials in paragraph (a) of this section, or does not make the demonstration in paragraph (b) of this section, he must close the impoundment and provide post-closure care as for a landfill under Subpart G..." (May 19, 1980).

- The Administrative Order states "The Site is an operating waste oil reclamation facility..."  "The tank farm at the Site consists of 12 vertical tanks, 11 horizontal tanks, 5 compartmentalized, 2 buried tankers, and 3 underground storage tanks."

- The Administrative Order states that Work Plan 1 shall require " a.  Secure the Site by repairing all gaps in the fence surrounding the Site. b.  Remove and properly store or dispose of all free standing oil in dikes; repair cracked or slumping dikes surrounding all above ground tanks which contain any liquids, and take necessary measures to prevent the release of liquids from the oil/water separator, the lagoon, dikes, or tanks."  In addition Work Plan 1 required  "c. Remove and properly treat or dispose of all liquids contaminated with PCBs or any other hazardous substance or hazardous waste."

- The Administrative Order states that Work Plan 2 shall include "Remove and properly dispose of all soil and sludge contaminated with PCBs or any other hazardous substance or hazardous waste."

**ROUX ASSOCIATES, INC.**                    -9-                    W\WS44502Y.141/R

- The Hazardous Waste Permit Application for the facility states the nature of the business is "transporting and storage of waste petroleum products, primarily lube oil". The application lists tanks under storage and incineration under treatment

- The Notification of Hazardous Waste Activity form lists the type of hazardous waste activity as "c. Treat/store/dispose".

## Opinion 3 References:

United States Environmental Protection Agency Region V; October 5, 1990. Administrative Order

United States Environmental Protection Agency; November 21, 1990. Hazardous Waste Permit Application.

United States Environmental Protection Agency; October 17, 1980. Notification of Hazardous Waste Activity.

## Opinion 4:  No elements of the Huth Oil Site remedies are associated with off-site cleanup.

### Bases for Opinion 4.

- The September 5, 1990 USEPA Preliminary Assessment states "The sampling results reported by the Technical Assistance Team (TAT) indicate a localized PCB contamination problem within the property boundaries. Significant off-site migration or tracking does not appear to have occurred."

- The Fact Sheet states "The Order required the Respondents to perform removal actions to address the contamination by PCBs and other hazardous substances at the Site."

## Opinion 4 References:

United State Environmental Protection Agency; September 5, 1990. Potential Hazardous Waste Site Preliminary Assessment.

-----; no date. Huth Oil Site Fact Sheet.

## 4.0 J.C. RHODES SITE

**Opinion 1:  Environmental activities completed and/or proposed at the J.C. Rhodes Site, including excavation and off-site disposal, are associated with Site remediation.**

**Bases for Opinion 1.**

- The Interim Phase II- Comprehensive Site Assessment states "During February 1988, H&A monitored remedial excavations to remove soils contaminated with dichlorobenzene (DCB) and other volatile organic compounds (VOCs) in the vicinity of the wastewater trench system.  An estimated 300 cu. yds. of soil were excavated and transported off-site for disposal by Clean Harbors, Inc., a licensed hazardous waste contractor."    "Excavations were advanced until contaminants were below detection limits, the water table was reached, or further removal was prevented by physical barriers or plant operations."

- The Phase II Risk characterization states "The results of the Risk Characterization for unrestricted maximum potential uses, such as a residence, indicate that Site conditions present 'No Significant Risk' of harm to human health for potential exposures to compounds of concern.  Based on this finding, additional remediation or an Activity and Use Limitation is not required for the Site, and unrestricted use of the Site (i.e., use as a residence, or for construction work) is permitted."

- The Response Action Outcome Statement states "Excavations were advanced until contaminants were below detection limits, the water table was reached, or further removal was prevented by physical barriers or plant operations.  To undertake additional removal actions to obtain background levels...would require underpinning and/or demolition of the existing building or equipment foundations, and disruption to plant operations."

- The Report on Site Remedial Action states "To prevent the clean soil that would be used as backfill from coming into contact with the contaminated soil left in place, 2 layers of polyethylene, each 3 mil thick, were molded to the sidewalls and floor of the entire excavation before backfilling."

**Opinion 1 References:**

Haley & Aldrich, Inc.; September 1996.  Phase II Risk Characterization, Emhart/PCI Group, Inc.

Haley & Aldrich, Inc.; October 1995.    Report on Interim Phase II-Comprehensive Site Assessment, Emhart/PCI Group, Inc.

Haley & Aldrich, Inc.; April 1987.  Report on Site Remedial Action, Emhart/PCI Group.

**Opinion 2:  No elements of the J.C. Rhodes Site remedies are associated with ground-water remediation.**

**Bases for Opinion 2.**

- The Response Action Outcome Statement states "Concentrations of VOCs in groundwater in the immediate vicinity of the two previously identified source areas (the rear loading dock and the wastewater trench system) continued to decrease since the 1987/1988 sampling rounds."

- The Response Action Outcome Statement states "VOCs detected in groundwater recovered on-site during December 1994, typically meet the MCP Method 1 GW-2 groundwater standards, except for 1,1,-dichloroethylene in the area downgradient (south) of the rear loading dock."

- The Phase II Risk Characterization states "The current and foreseeable use of the Site for commercial purposes is not impaired by the levels of COC [compounds of concern] present in soil, groundwater, and surface water;.."

- The Phase II Risk Characterization states "It is unlikely that the COC present in the Site's soil and groundwater would degrade nearby public or private resources since source areas have been removed, and data indicate that the COC levels have declined over time.  In addition, the levels of COC in soil, groundwater, and surface water are expected to diminish further over time."

- The Response Action Outcome Statement states "In accordance with the DEP Site Scoring Map, ....groundwater at the site and surrounding properties is currently classified as a "Non-Potentially Productive High Yield Aquifer," (i.e., not a potential source of drinking water).  Therefore, GW-2 and GW-3 standards currently apply to the site and surrounding properties.

**Opinion 2 References:**

Haley & Aldrich, Inc.; September 1996.  Response Action Outcome Statement, Emhart/PCI Group, Inc.

Haley & Aldrich, Inc.; September 1996.  Phase II Risk Characterization, Emhart/PCI Group, Inc.

**Opinion 3:  Environmental activities completed and/or proposed at the New Bedford Site, including removing and disposing of soils and sludges contaminated with hazardous substances, as well as removal of intact underground storage tanks, are ordinary operational and closure requirements.**

**Bases for Opinion 3.**

- Subpart K (Surface Impoundments) of the Hazardous Waste Regulations (40 CFR Part 265.228) states "At closure the owner or operator may elect to remove from the impoundment: (1) Standing liquids; (2) Waste and waste residues; (3) The liner, if any; and (4) Underlying and surrounding contaminated soil." (May 19, 1980).

- The Proposed Hazardous Waste Rules (43 Federal Register 59012) states that upon final closure, all hazardous waste and hazardous waste residuals shall be removed from the surface impoundment. (December 18, 1978).

- The USEPA May 12, 1994 memorandum states that an unlined ditch system "can not be considered ancillary equipment to a tank...within the meaning of "tank systems" in 40 CFR 260.10. Therefore, the ditch system is not eligible for the wastewater treatment unit exemption."

- The USEPA February 1, 1994 memorandum states "Since the conveyance system received hazardous waste after January 26, 1982, it is subject to full Part 264/265 regulation as a hazardous waste management unit." "If it can be determined that waste is actually being impounded (for example, in depressions in the drainage system), then the ditch system should be considered a surface impoundment..."

- The Interim Phase II- Comprehensive Site Assessment states "Two 10,000 gallon underground No. 6 fuel oil tanks also served the facility at that time but were removed in November 1987 and replaced with a 15,000 above-ground tank contained in a concrete vault."

- The Interim Phase II - Comprehensive Site Assessment states "Four soil samples....were analyzed for TPH to evaluate possible petroleum oil releases at the former location of the underground fuel oil storage tanks (UST) or at the former railroad spur loading/unloading area. Results indicated that TPH was not detected in the soil samples with the exception of 160 mg/kg TPH in soil sample B401-S2 (former UST area). This sample also exhibited apparent petroleum staining. However, the detected TPH concentration did not exceed the MCP Method 1 soil category S-1, S-2 or S-3 standards."

- In accordance with USEPA Underground Storage Tanks Final Rules (40 CFR Part 280), release detection for tanks installed before 1965 (or date unknown) must begin by December 22, 1989 (40 CFR Part 280.40). It further states that any existing UST that cannot apply a method of release detection that complies with the requirements must complete closure procedures by the date on which release detection is required.

**Opinion 3 References:**

Haley & Aldrich, Inc.; October 1995.    Report on Interim Phase II-Comprehensive Site Assessment, Emhart/PCI Group, Inc.

United States Environmental Protection Agency; February 1, 1994. Regulatory Status of Shell Oil's Norco, Louisiana Facility Ditch System.

United States Environmental Protection Agency; May 12, 1994. Clarification of the Regulatory Status of a Refinery Ditch System.

**Opinion 4:   No elements of the J.C. Rhodes Site remedies are associated with off-site cleanup.**

**Bases for Opinion 4.**

- The Phase II Risk Characterization states "It is unlikely that the COC present in the Site's soil and groundwater would degrade nearby public or private resources since source areas have been removed, and data indicate that the COC levels have declined over time.  In addition, the levels of COC in soil, groundwater, and surface water are expected to diminish further over time."

**Opinion 4 References:**

Haley & Aldrich, Inc.; September 1996.  Phase II Risk Characterization, Emhart/PCI Group, Inc.

## 5.0 FORMER WHITMAN METALS PRODUCT SITE

**Opinion 1:** Environmental activities completed and/or proposed at the Former Whitman Metal Products Site as part of the RAM including ground-water recovery with high vacuum soil vapor extraction, as well ground-water monitoring, are preventative and are not designed to remediate environmental harm.

Bases for Opinion 1.

- The Release Abatement Measure Status Report states "The objective of the RAM was to extract spent solvents and machine oils from beneath the East Parking Area and to mitigate off-site migration of groundwater containing dissolved solvent or machine oil constituents."

- The Release Abatement Measure Status Report states "Quarterly groundwater monitoring and analyses are planned to evaluate effectiveness of the 2-PHASE system in reducing the mass of source area contaminants and mitigating off-site migration."

- The Release Abatement Measure Status Report states "Additional response actions are planned, separate from the RAM, to meet MCP Phase II and Phase III requirements with the objective of achieving a Class C RAO in accordance with 310 CMR 40.1050."

- The Report on 2-Phase Vacuum Extraction Pilot Test and Comparison of Remedial Alternatives states "...interim remedial measures should be directed toward: 1) removal of NAPL oil and higher concentrations of dissolved VOCs from soil and groundwater in the settling chamber source area, and 2) mitigating off-site migration of dissolved VOCs."

- The Report on 2-Phase Vacuum Extraction Pilot Test and Comparison of Remedial Alternatives states "After a reasonable period of time, envisioned to be on the order of six to twelve months, achieved soil remediation would be evaluated through a test boring/analytical program. If necessary, limited source area excavations could then be undertaken to augment the VES system."

**Opinion 1 References:**

Haley & Aldrich, Inc.; March 1996. Release Abatement Measure Status Report No. 1, Former Whitman Metal Products Division.

Haley & Aldrich, Inc.; April 1995. Report on 2-Phase Vacuum Extraction Pilot Test and Comparison of Remedial Alternatives, Former Whitman Metal Products Division.

**Opinion 2:** No elements of the Site remedies are associated with ground-water remediation.

Basis for Opinion 2.

- The March 3, 1993 Haley & Aldrich correspondence states "The objectives of the Interim Measure Feasibility Evaluation were to evaluate the feasibility of extracting and treating groundwater in the East Parking Area, to assess potential exposure points and

health and environmental risks associated with the presence of groundwater contamination in the East Parking Area, and to evaluate the need for remediation of contaminated groundwater.

**Opinion 2 References:**

Haley & Aldrich, Inc.; March 3, 1993. Correspondence from Brian C. Vickers to Mary Ellen McBrine, Massachusetts Department of Environmental Protection regarding Report on Interim Measure Feasibility Evaluation.

**Opinion 3: Environmental activities completed and or proposed at the Site, including securing the Site, removal of NAPL oil and dissolved VOCs from soil and ground water, ground water monitoring, as well as the removal of intact underground storage tanks, are ordinary operational and closure requirements.**

**Bases for Opinion 3.**

- In accordance with 40 CFR Part 260.10, examples of surface impoundments include holding, storage, settling, and aeration pits, ponds, and lagoons (May 19, 1980).

- The Proposed Hazardous Waste Rules (43 Federal Register 59012) states that upon final closure, all hazardous waste and hazardous waste residuals shall be removed from the surface impoundment (December 18, 1978).

- Subpart K (Surface Impoundments) of the Hazardous Waste Regulations (40 CFR Part 265.228) states "At closure the owner or operator may elect to remove from the impoundment: (1) Standing liquids; (2) Waste and waste residues; (3) The liner, if any; and (4) Underlying and surrounding contaminated soil." The rule further states "If the owner or operator does not remove all the impoundment materials in paragraph (a) of this section, or does not make the demonstration in paragraph (b) of this section, he must close the impoundment and provide post-closure care as for a landfill under Subpart G..." (May 19, 1980).

- The Release Abatement Measure Status Report states "....and Phase III development of feasible remedial alternatives for the historical discharges of spent solvents and petroleum oils from the East Parking Area settling chambers."

- The Report on Interim Measure Feasibility Evaluation states "Based on observations made during clean-out of the settling chambers, the settling chambers were constructed from cinder/concrete blocks, and the bottoms of the settling chambers are unlined."

- The Limited Site Investigation states "Sludge which collected on the bottom of the chambers was removed and hauled off-site approximately once every 6 or 7 years. The sludge was removed by a vacuum and by hand with a pick and shovel. The most recent sludge removal reportedly occurred in 1986 or 1987."

- The Report on 2-Phase Extraction states "Security: fencing and security personnel should be provided as needed..."

- The Report on Oil and Hazardous Material Site Evaluation states "One tank, 8,100 gallons in capacity, is currently inactive and is scheduled to be abandoned in-place in the near future in accordance with state regulations."

- The Limited Site Investigation states "An underground fuel oil (No. 4) storage tank was located west of the boiler room...This steel tank, which was 8,100 gallons in capacity was taken out of service in October 1986....It was subsequently emptied, cleaned, and filled with sand."

- The Report on Oil and Hazardous Material Site Evaluation states "An active 10,000 gallon capacity underground storage tank currently supplies fuel for the boilers....The tank was installed in about 1948, and was recently inspected for potential leaks by a licensed contractor. The tank was reportedly structurally sound with no evidence of oil and water seeping out of or into the tank."

- The Limited Site Investigation states that for the 10,000 gallon No. 4 fuel oil tank "Clean Harbors, Inc. pumped, visually inspected the integrity of the tank's inner walls, ceiling, and floor in 1987, and no evidence of leakage was found. The tank was subsequently abandoned in place with permission of the Whitman Fire Department."

- In accordance with USEPA Underground Storage Tanks Final Rules (40 CFR Part 280), Release detection for tanks installed before 1965 (or date unknown) must begin by December 22, 1989 (40 CFR Part 280.40). It further states that any existing UST that cannot apply a method of release detection that complies with the requirements must complete closure procedures by the date on which release detection is required.

## Opinion 3 References:

Haley & Aldrich, Inc.; March 1996. Release Abatement Measure Status Report No. 1, Former Whitman Metal Products Division.

Haley & Aldrich, Inc.; March 1993. Report on Interim Measure Feasibility Evaluation, Former Whitman Metal Products Division.

Haley & Aldrich, Inc.; July 1987. Report on Oil and Hazardous Material Site Evaluation PCI-Whitman Plant.

Haley & Aldrich, Inc.; July 1990. DEP Phase I - Limited Site Investigation/EPA Site Inspection, Former Whitman Metal Products Division.

USEPA; 1988. Underground Storage Tanks: Technical Requirements and State Program Approval; Final Rules (40 CFR Part 280).

Haley & Aldrich, Inc.; April 1995. Report on 2-Phase Vacuum Extraction Pilot Test and Comparison of Remedial Alternatives, Former Whitman Metal Products Division.

## Opinion 4: No elements of the Site remedies are associated with off-site cleanup.

## Bases for Opinion 4.

- The Release Abatement Measure Status Report states "Five vacuum extraction wells (VE1-VE5) and one recovery well (RW-2) were installed in the East Parking Area..."

- The Report on Interim Measure Feasibility Evaluation states "The objectives of a groundwater extraction and treatment system would be as follows:

  - remove groundwater containing dissolved VOCs from bedrock in the vicinity of the settling chambers, where the release is believed to have occurred;

  - mitigate the off-site migration in bedrock of groundwater containing dissolved VOCs; and

  - treat the extracted groundwater to reduce the levels of VOCs to concentrations which are acceptable for discharge to a storm drain or sanitary sewer system."

- The Release Abatement Measure Status Report states "These conditions suggest that soil contamination is localized within in the area of the settling chambers, SC-1 to SC-3."

**Opinion 4 References:**

Haley & Aldrich, Inc.; March 1996.  Release Abatement Measure Status Report No. 1, Former Whitman Metal Products Division.

Haley & Aldrich, Inc.; March 1993.  Report on Interim Measure Feasibility Evaluation, Former Whitman Metal Products Division.

Respectfully Submitted,

ROUX ASSOCIATES, INC.

Peter J. Gerbasi, P.E.
Principal Engineer

**APPENDIX A**

**Professional Profiles**

**ROUX**                                        # Professional Profile

---

## Peter J. Gerbasi, P.E.
### Principal Engineer

---

**Technical Specialties:**
Remedial design and construction management at hazardous and industrial waste sites. Feasibility studies for remediation of soil and ground-water. Remedial designs include site closures, air sparging, air stripping, biological and chemical treatment, soil vapor extraction and catalytic oxidation. Air emissions control and permitting.

**Experience Summary:**
13 years of experience: Principal Engineer with Roux Associates; and Lead Project Engineer at Camp Dresser and Mckee.

**Credentials:**
B.E., Civil Engineering, Manhattan College, 1985.
M.E., Environmental Engineering, Manhattan College, 1989.
Professional Engineer, State of New York, 1993.

**Professional Affiliations:**
New York Water Pollution Control Association, Kenneth Allen Memorial Award Co-recipient, 1988.
New York Water Pollution Control Association, Industrial and Hazardous Waste Committee.
Water Environment Federation.

**Papers and Presentations:**
Major Gasoline Spill Remediation Requires Integrated Approach - Coauthored paper presented at the WEF 65th Annual Conference and Exposition, 1992.
Biological Treatment of Gasoline Contaminated Groundwater - Coauthored paper presented at the NWWA/API Petroleum Hydrocarbons and Organic Chemicals in Groundwater Conference, 1991.
Gasoline Contaminated Groundwater Treatment Study - Coauthored paper presented at the 47th Annual Purdue University Industrial Waste Conference, 1992.
Field Testing of Fine Bubble Aeration Systems; Ridgewood, A Case Study - Presented at the 58th Annual Meeting of the New York Water Pollution Control Association, 1986.
Using Leaching Tests to Estimate VOC Availability for Transport in GroundWater - Presented at the 60th Annual Meeting of the New York Water Pollution Control Association, 1988.

**Key Projects:**
- Principal Engineer responsible for the implementation of the Building Demolition Program at a metals reprocessing facility in Staten Island, New York. Responsibilities also included project management of lead and asbestos abatement programs, a UST removal program, facility demolition and material disposal, and the preparation of progress reports and a final completion report

- Lead Project Engineer responsible for all design work to remediate a 1-million gallon gasoline spill at the Long Island terminal of a large petrochemical distributor. The work included the design of a 1.5-mgd ground-water treatment facility which included performing pilot studies for treatment of metals and volatile organic compounds and preparing a design report. Also responsible for coordinating, performing, and directing the design of processes for biological treatment using a GAC fluidized bed for removal of VOCs (primarily BTEX), metals

precipitation for the removal of iron and manganese, air stripping with vapor phase carbon treatment for the final polishing and removal of VOCs, mixed media filtration, and ion exchange.

- Senior Manager responsible for the design, construction, and operation of a 75 gpm interim remedial measure (IRM) treatment facility which included oil/water separation, chemical injection for pH control, packed tower air stripping, and vapor phase carbon adsorption. Responsibilities included preparing contract documents and permit applications, reviewing shop drawing submittals, performing on-site inspections, directing facility startup and plant operation and maintenance activities, oversight of field testing and the design of recharge basins for discharge of IRM facility effluent, and conducting effluent and ground-water sampling. Performed site inspection and administered activities for $2.5 M construction project.

- Senior Manager responsible for the implementation and operation of a soil vapor extraction pilot study at an east coast petroleum distribution terminal. Responsibilities included performing civil and site design and construction services for a 2,000-scfm vapor extraction and treatment facility at the site. The installations included over 5,000 feet of 20- and 12-inch diameter HDPE pipe and appurtenances and four 100-foot deep, 12-inch diameter extraction wells.

- Principal Engineer responsible for final design, construction and operation of a 30 gpm ground water extraction system for the recovery of chromium contaminated ground water from a New York City manufacturing facility. Discharge of the system is to an existing public sewer system. Operations include telemonitoring of system functions to reduce O & M costs.

- Lead Design Engineer for the pilot study, full-scale design and operation of an air sparging system for the remediation of gasoline-contaminated ground water and soils. The pilot study was performed on a 2-acre area and lead to design of a 120 scfm, full-scale air sparging and SVE remediation system that is being used, in a phased approach, to remediate a 20-acre site.

- Lead Project Engineer responsible for design team implementing a Discharge Prevention and Containment Compliance (DPCC) program at an industrial facility. Performed mechanical process design of a 25 gpm industrial stormwater treatment facility. Processes included influent heating, oil/water separation, direct filtration and liquid phase carbon adsorption.

- Engineer for a U.S. Army Corps of Engineers remediation and construction project in New Jersey. Responsibilities included: predesign site surveys; geotechnical investigations; ground water treatability studies to determine extent of heavy metal and VOC contamination; design of the excavation and removal of contaminated soil; and performance of construction management services during site remediation, also performed hydraulic analysis and design services for the installation of a 6,500-foot, 12-inch diameter ductile iron water supply main to provide an alternate water supply.