# EXPERT REPORT

## Huth Oil Site,
Cleveland, Ohio

April 30, 1998

Prepared For

## Liberty Mutual Insurance Company

For Use In The Action

*Liberty Mutual Insurance Company v.*
*The Black & Decker Corporation et al.,*
U.S.D.C., D. Mass., C.A. No. 96-10804-DPW

Prepared by

Dr. Melville P. Dickenson, III, LSP,
Senior Scientist
**Woodard & Curran**
980 Washington Street
Dedham, Massachusetts 02026
&
41 Hutchins Drive
Portland, Maine 04102

## 1.0 INTRODUCTION

This Expert's Report regarding the Huth Oil site is prepared by Dr. Melville P. Dickenson, III, LSP, Senior Scientist, Woodard & Curran, Inc., at the request of Liberty Mutual Insurance Company in <u>Liberty Mutual Insurance Company v. Black & Decker et al.</u>  An overview of the site is presented in Section 2.0. The opinions developed in this report are presented in Section 3.0, and are based on the following sources of information:

- depositions from individuals historically associated with the site;

- historical information regarding the site;

- Dr. Dickenson's professional experience in hydrogeology, geochemistry, and in the investigation and remediation of contaminated sites, including industrial sites in Massachusetts and New England.

The professional profile for Mr. Dickenson is attached at Appendix A.  A listing of documents reviewed is included with the specific opinions.

## 2.0 OVERVIEW

The Huth Oil Site is located in Cleveland, Ohio.  The property consists of approximately 2.5 acres of land which were the location of a waste oil reclamation facility from 1938 to 1990.  The site is currently being managed as a Superfund site.  Investigation and cleanup activities were carried out under USEPA supervision by a consortium known as the Huth Oil Group, consisting of Ashland Chemical Company ("Ashland"), General Electric Company ("General Electric"), and the Cleveland Electric Illuminating Company ("CEI").  The Huth Oil Group has identified a large number of PRPs, and has taken action for contribution/cost recovery.  This action includes Black & Decker, who is alleged to have been a customer of Huth Oil Company and a contributor to the site contamination.

The Huth Oil Service Company ("Huth Oil") was established in 1938 by George J. Huth, on property leased from the Columbia Refining Company.  The lease was transferred to the Ashland Oil Company in 1964.  George Huth leased the property from Ashland Oil Company until 1981 when he purchased the property.  The Site was owned by Huth Oil from 1986 to 1990.  George Huth died in 1990.  The Site subsequently was managed under Superfund by the USEPA and the above-mentioned Huth Oil Group.

The immediate area of the Site is primarily light industrial, with some residential properties located in the vicinity.  The tank farm at the site consisted of (approximately) 12 vertical tanks, 11 horizontal tanks, 5 compartmentalized tankers, and 3 underground storage tanks.  The tank farm had a storage capacity of approximately 1 million gallons.

During its operation Huth Oil received and stored waste oil for reclamation (most if not all of which was apparently done off-site), which included PCB-containing oil from transformer reclaimers, most notably General Electric and CEI.  Information exists which suggests that, at some point, a solvent reclaimer

(Bronoco Solvents) and a "paint removing" operation were located on-site. Later investigations identified solvent and heavy metal contamination on the site in addition to PCB contaminated soil, oils and sludges.

Documentation dating back to the 1980's indicates poor housekeeping and maintenance, and the visual evidence of oil contamination on the ground and in storm drainages. Documented suspect contamination pathways include soil, off-site surface water drainage, and volatiles to air. Groundwater was not discussed in the available documentation. Based on available documents, there is no record of sudden releases of oil and/or hazardous materials to soil and/or groundwater beneath the site.

USEPA and Ohio EPA inspections dating back to 1983 focused on PCB-related violations and contamination. Enforcement action leading to the eventual cleanup was begun in 1990, and was driven by PCB contamination.

Responsible parties named in the USEPA enforcement action were Huth Oil, Ashland Chemical (apparently due to past ownership of the property), General Electric and CEI (both apparently large volume customers who contributed PCB-containing transformer oils).

Ashland Chemical, General Electric, and CEI (collectively referenced in documentation as The Huth Oil Group) apparently conducted site cleanup activities and "incurred response costs" during some period between 1990 and 1994. "Removal actions" conducted under CERCLA included "...securing the Site; developing work plans; removing, storing, and disposing of free standing oils; dismantling tank equipment; removing and disposing of soils and sludges contaminated with hazardous substances; and installing a surface cover over the Site." There is some indication that solvents and other hazardous materials were addressed in addition to the primary PCB issue; however, as noted below, this could not be confirmed.

The Huth Oil Group claims to have incurred a total of approximately $13.5 million in response costs by 1994; this amount includes Site cleanup, EPA oversight and PRP investigation costs. The Huth Oil Group expressed a goal of collecting $12.3 million of these expenses from the "Huth Oil Site PRPs" (see below).

The Huth Oil Group identified approximately 250 entities which were listed as Potentially Responsible Parties (PRPs), based on different types of evidence allegedly tying these entities to the former Huth Oil Site. This list includes Black & Decker. The PRPs were approached for contribution and approximately 50 parties reached settlement agreements with the Huth Oil Group at different points in time.

In May 1994 a settlement agreement was offered by the Huth Oil Group to the PRPs. This proposed agreement divided the PRPs into "tiers" based on their alleged volumetric contribution to the former Huth Oil Services as determined through the Huth Oil Group's interpretation of their evidence. Black & Decker was listed in Tier IV, with a settlement demand of $50,000.

## 3.0 OPINIONS

**Opinion 1:    The environmental harm at the Huth Oil Site appears to consist only of soil contamination.**

- The significant contamination at the Huth Oil site was related to the distribution of polychlorinated biphenyls(PCBs) within waste oils at the facility. The PCBs were believed to have arrived at the site within waste oils that included dielectric fluids drained from electrical transformers. Prior to the passage of the Toxic Substance Control Act (TSCA) in 1978, transformer oils containing PCBs were disposed like all other waste oils. The dielectric oils containing PCBs were routinely mixed with other waste oils. These oil-PCB mixtures were typically disposed as waste oil at the Huth Oil site.

- USEPA and Ohio EPA inspections dating back to 1983 focused on PCB-related violations and contamination. Enforcement action leading to the eventual cleanup was begun in 1990, and was driven by PCB contamination.

**Opinion 2:    The harm at the Huth Oil Site is a result of discharges of pollutants that were gradual and protracted.**

- The Huth Oil site operated from 1938 to 1990. The EPA Technical Assistance Team (TAT) conducted a site visit in June 1988. The TAT identified SPCC violations, including tanks without dikes, free standing oil in dikes, severely corroding tanks, cracked or slumping dike walls, uncontained water from the oil /water separators draining off-site, and other violations. The TAT determined that the site was in a very "dilapidated condition". Thus, the long-term operation of the facility in a poor condition ultimately resulted in releases of PCB-contaminated oil to the environment.

- Documentation dating back to the 1980's indicates poor housekeeping and maintenance, and the visual evidence of oil contamination on the ground and in storm drainages

- A fire at the site in 1953 was alleged to have been caused by lightning purportedly striking one of the above ground light oil tanks. A "tremendous amount" of the oil released at that time was apparently consumed in the fire itself. There is no evidence in the record that this release of oil in 1953, was anything more than a *deminimis* source of any environmental harm during the 1970s and 1980s.

## Opinion References

Huth Oil Site Fact Sheet. Confidential Information No. MS4-0069.

Letter dated October 5, 1990 from US EPA enclosing an Administrative Order issued by the US EPA. Confidential Information No. MS4-0073 – MS4-0111.

An Administrative Order issued on October 5, 1990, in the matter of Huth Oil Services Company Site. US EPA Region V Dock No. V-W-90-C-74.

Memorandum dated March 30, 1994, to Huth Oil Site PRPs from The Huth Oil Group, re: Revised Site Settlement Agreement dated April 15, 1994, and Huth Oil Settlement Process Status Report and Meeting Notice. Confidential Information No. MS4-0002.

Letter dated April 6, 1994 to H. Rodgville of B & D from D. Dumas of Thompson, Hine and Flory enclosing copies of documents in their possession. Confidential Information No. MS4-0068.

Site Settlement Agreement dated May 3, 1994, between Ashland Chemical Company, Centerior Service Company as Agent for the Cleveland Electric Illuminating Company and General Electric Company (a/k/a Huth Oil Group). Confidential Information No. MS4-0192 – MS4-0209.

Letter dated January 18, 1995, from M. Margiotta of Alexander & Alexander to Interested Underwriters enclosing documentation from B & D re: Huth Oil Site matter. Includes July 1, 1994 information letter.

Letter to J. Ensor of Miles & Stockbridge from M. Tower of Arter & Hadden enclosed the interview transcripts from Consulting Investigators Inc. dated November 20, 1991. Confidential Information No. MS5-0678 – MS5-0698.

Memorandum to M. Hwang from T. Lynch dated August 16, 1995 regarding the joint report of Planning Meeting between Plaintiffs and Defendants. Confidential Information No. MS3-0381 - MS3-0395.

B & D Claim Letter. Letter dated August 16, 1996, to Paul Harris of The Home Insurance Company re: formal demand. Confidential Information BD115-2188 – BD115-2193.

Letter dated October 6, 1996 to L. Phillips of Irell & Manella from D. Haynam of Fuller & Henry re: Huth Oil Superfund Mediation. Confidential Memorandum No. MS4-0148 – MS4-0152.

Letter dated January 15, 1997, from M. Lonnie Terry of the Ohio EPA enclosing all available information on Huth Oil Company.

EPA Potential Hazardous Waste Site Preliminary Assessment dated September 5, 1990.

1991 OEPA letter with site listing.

1990 NPL worksheet.

1981 Generator Inspection Report.

1980 Part A Application

B & D's Motion to Dismiss. Plaintiff: Centerior Service Company and General Electric Company; Defendants: Allied Signal Inc., Black & Decker Corporation and Rockwell International Corporation. Confidential Information No. MS2-1949.

Memorandum in Support of Defendant B & D's Motion to Dismiss. Confidential Information No. MS2-1953 – MS2-1991.

Deposition of Richard Stutzman, dated September 12, 1995.

11478-122:238424 v1

Certification for expert opinion for *Huth Oil Site, Cleveland, Ohio.*

_____        4/31/98_____
Melville P. Dickenson, Ph.D., LSP            Date



# WOODARD & CURRAN
Engineering • Science • Operations

**Melville P. Dickenson**

## Professional Profile

Dr. Dickenson brings more than 10 years of experience in environmental geochemistry and hazardous waste studies to his position as Senior Geochemist at Woodard & Curran. Areas of particular technical expertise include fluid-rock and fluid-sediment interactions, geohydrology, contamination assessment, and fate and transport of organic and inorganic contamination. He has an excellent understanding of both the CERCLA and RCRA processes. Dr. Dickenson has considerable experience designing and implementing complex remedial investigations, conducting groundwater contamination assessments, and supervising feasibility study engineering to ensure that the final alternatives selected achieve the desired clean-up goals. He has significant experience in negotiating clean-up criteria with the USEPA and numerous state environmental agencies. He is a Licensed Site Professional in Massachusetts.

## Education

Ph.D., Brown University, Geochemistry, 1984
M.S., Brown University, Geochemistry, 1980
B.S., University of Rhode Island, Geology Sciences, 1978

## Professional Associations

Geological Society of America

## Related Experience

- Dr. Dickenson is a Licensed Site Professional (LSP) in the State of Massachusetts. As an LSP, Dr. Dickenson has the responsibility to review and approve of all four key phases of the Massachusetts Contingency Plan. As part of his LSP responsibility, Dr. Dickenson has recently managed the clean-up activities at several sites in Massachusetts. These sites have included underground storage tank removals, soil and groundwater investigations, and immediate response acting.

- Dr. Dickenson has supported a large automobile sales company in Maine in a lawsuit involving its automobile paint shop. His responsibilities included supporting the legal team in identifying specific CERCLA/NCP technical issues for the case, evaluating the study and cleanup of the site, and determining the fate and transport of chemicals (petroleum hydrocarbons and paint thinners) released into the environment.

- Dr. Dickenson has provided expert witness support for a national insurance company in support of a lawsuit filed by a chemical manufacturer in Rhode Island. His specific responsibilities have included evaluating and reviewing the RI/FS studies conducted at the site, reviewing depositions filed by others, and identifying fate and transport of chlorinated solvents released to the environment.



# WOODARD & CURRAN
Engineering • Science • Operations

Melville P. Dickenson
Page 2

- Dr. Dickenson and Woodard & Curran have been retained by the Stop and Shop companies to serve as the LSP for all Stop and Shop properties in Massachusetts. Dr. Dickenson's responsibilities include reviewing and approving environmental studies, approving clean-up activities, developing appropriate MCP actions, and supporting Stop and Shop's environmental needs.

- Dr. Dickenson provided expert witness support for Pierce, Atwood, Scribner, Allen, Smith & Lancaster and Texaco for a site in mid-coast Maine. The issues at the site were focused on gasoline contaminated groundwater from leaking underground storage tanks. The project involved evaluating hydrogeology, contaminant fate and transport, and cost analysis of developing, designing, and constructing a small public water supply system. Dr. Dickenson's evaluation of the water supply system was supported by in-house experts at Woodard & Curran. The case is currently being reviewed by the Maine DEP.

- Dr. Dickenson served as Project Manager and Technical Lead for an RI/FS project at the Brunswick Naval Air Station (BNAS), a Superfund project with 16 separate sites. In this role he supervised the design and implementation of the RI/FS program, which required a comprehensive knowledge of CERCLA and SARA. The project has progressed through the RI/FS stage and several sites are in the Record of Decision (ROD)/Design phase of the cleanup process. BNAS was the first site in Maine and EPA Region I to use the cone penetrometer for a hazardous waste application. This technique was accepted by the regulatory agencies and reduced the field program, providing BNAS significant cost savings. As part of his role as Technical Lead Dr. Dickenson participated in many critical technical and programmatic negotiations with the MEDEP and the USEPA.

- Developed detailed groundwater model for a large industrial facility in Maine under the RCRA Corrective Action Program. This facility is under a Consent Order to implement groundwater remediation. A three dimensional flow model was developed to aid in the placement of the extraction wells to contain groundwater contaminated with PCE, TCE, and 1,1,1-TCA. This model is being used to evaluate the potential remediation time frame, interim measures, long-term cleanup measures, and the effect of upgradient recharge to the hydrologic system.

- Project Manager assisting a confidential chemical company in Connecticut to fulfill the requirements of the RCRA Correction Action process at their century old facility in Connecticut. This work is being conducted proactively and is not being required by an EPA Consent Order. The first phase of this project consisted of performing an environmental assessment for the entire 50 acre facility to identify the potential for environmental contamination from any current or past production or disposal area through the facility. As a follow-up to the facility-wide environmental assessment, Woodard & Curran is in the process of performing a RCRA facility investigation for the 15 identified areas. This program consists of soil test pits, soil sampling, installation of monitoring wells (both in the overburden and bedrock), groundwater sampling, and the use of microwells, which is an innovative field screening technique.



# WOODARD & CURRAN
Engineering · Science · Operations

**Melville P. Dickenson**
**Page 3**

- Dr. Dickenson was the Project Manager for a Phase II Site Assessment at the former Nachi Ball Bearing facility in Maine. Using an innovative investigation program, he installed approximately 14 microwells and field screened the groundwater for chlorinated solvents at several depths. As a result of this work, which defined a very limited contaminant distribution, Woodard & Curran was able to get the MEDEP to accept a no-action alternative for the site.

### Previous Work Experience

### ABB Environmental Services, Portland, Maine (1987-1992)
Prior to Woodard and Curran, Dr. Dickenson was a senior scientist and senior project manager at ABB Environmental Services. His responsibilities included senior technical review, technical lead, and/or project manager for a number of hazardous waste and related projects. He has designed contamination assessments and developed the technical approach on numerous hazardous waste projects including:

- Sullivan Landfill, Sullivan, MO
- TRW, Cambridge, MA
- Delaware Air National Guard Base, New Castle, DE

In particular, Dr. Dickenson has pioneered the use of innovative approaches in field sampling programs including the cone penetrometer (CPT). The use of the CPT at BNAS, mentioned earlier, was the first application of the technology in the State of Maine and in USEPA Region I. The CPT results, when combined with a field GC sampling and screening, resulted in a complete groundwater assessment and hydrogeologic understanding that required only one field season to complete. The level of site understanding developed in one field season led to a lower total project cost and improved the quality and accuracy of both the feasibility study and the remedial design portions of the project. The level of site understanding also enhanced regulatory negotiations and led to less conservative decision-making by the regulators. Finally, the project had significantly fewer permanent monitoring wells which resulted in continuing cost savings through the long-term monitoring portion of the project.

### Department of Geological Sciences, Virginia Tech, Blacksburg, Virginia (1985-1987)
Dr. Dickenson was an Assistant Professor in the Department of Geological Sciences at Virginia Tech, Blacksburg, VA. While at Virginia Tech Dr. Dickenson taught several geology courses and directed a graduate research program. He published numerous papers during his academic career.

### Department of Geological Sciences, Harvard University (1983-1984)
Dr. Dickenson was a Post-Doctorate Fellow in the Department of Geological Sciences, Harvard University. While at Harvard Dr. Dickenson developed several research projects concerning the geochemical behavior of water-rich fluids with sediments and rocks.



## WOODARD&CURRAN
Engineering · Science · Operations

Melville P. Dickenson
Page 4

*Publications*

Dickenson, M.P., 1988, "Local and Regional Differences in the Chemical Potential of Water in Amphibolite Facies Pelitic Schists." Journal of Metamorphic Geology, Volume 6, p. 365-381.

Dickenson, M.P. and Longley, T. D., 1991, "A Piezometric Cone Penetrometer and Field GC Study of the Distribution of Chlorinated VOCs in a Complex Hydrogeologic Setting." Geological Society of America, Abstracts with Programs, P. A187, Vol. 23, No. 5.

Dickenson, M.P. and Longley, T. D., 1991, "Use of Piezometric Cone Penetrometer to Define Geologic Controls on the Distribution of a Contaminant Plume." Proceedings of the FOCUS Conference on Eastern Groundwater Issues, Portland, Maine. Abstracts with Programs.

Hall, Peter J. and Dickenson, M.P., 1991, "Application of a Numerical Flow Model for Evaluating Remedial Alternatives at a Contaminated Landfill Site." Proceedings of the FOCUS Conference on Eastern Groundwater Issues, Portland, Maine. National Groundwater Association, P. 91-104.

Hall, Peter, J., Dickenson, M.P., and Lewis, Ronald, A., 1991, "Aquifer Restoration of a Complex Volatile Organic Plume Through Numerical Modeling." Proceedings of the Hazardous Materials Control Research Institute (HMCRI) National Research and Development Conference on the Controls of Hazardous Materials; San Francisco, CA, pp. 49-56.

Hall, Peter, J. and Dickenson, M.P., 1991, "An Evaluation of Aquifer Restoration Through Numerical Modeling Within a Complex Volatile Organic Plume." Geological Society of America, Abstracts with Programs, P. A121, Vol. 23, No. 5.

Carlson, E.T., and Dickenson, M.P., 1993, "Using a Three-Dimensional Groundwater Flow Model to Analyze Groundwater Cleanup Scenarios at a New England RCRA Site," Published in the proceedings of the 1993 Environmental Exposition and Conference of the Connecticut Groundwater Association. Presented Plantsville, CT, Sept. 1993.

# M.P. DICKENSON, III
# TESTIMONY HISTORY

Case:  Brown Realty Inc. and Fletcher Brown vs. Lee Dodge and Lee
       Management Co.

Deposition Date:  April 15, 1994

Court, Docket No.:  United States District Court, District of Maine
                    Civil Action No. 93-266-P-H

Case:  State of Maine and Department of Environmental Protection vs. Chevron,
       U.S.A., Inc.

Deposition Date:  May 9, 1996

Court, Docket No.:  State of Maine Superior Court Civil Action
                    Docket No. CV-95-79

Case:  Conductron Corp. vs. American Employers Inc. Co., Commercial Union
       Ins. Co., Hartford Casualty Ins. Co., and Pacific Employers Inc. Co.

Deposition Date:  March 1, 1996

Court, Docket No.:  State of New Hampshire, Hillsborough, SS Superior Court, Southern
                    District, Docket No. 93-C-599



**WOODARD & CURRAN**

**RATES**

## HOURLY RATE SCHEDULE

Melville P. Dickenson, III, Ph.D., LSP                    $140.00

# Expert's Report

**Huth Oil**
**Cleveland, Ohio**

*Liberty Mutual Insurance Company*
*v.*
*The Black & Decker Corporation, et al.*

**U.S.D.C., D. Mass. C.A. 96-10804-DPW**

**February 28, 2003**

*Prepared For*

**Liberty Mutual Insurance Company**

*Prepared by:*

**Peter Alvey**
**Principal Engineer**
**ROUX ASSOCIATES, INC.**
2000 Spring Road, Suite 110
Oak Brook, IL  60523

Peter D. Alvey, P.E.
Principal Engineer

**ROUX**

# TABLE OF CONTENTS

1.0 INTRODUCTION ....................................................................................................................1

2.0 SITE OVERVIEW ..................................................................................................................2

    2.1 Site Description and History.......................................................................................... 2

    2.2 Environmental Activities .............................................................................................. 2

3.0 OPINIONS ...............................................................................................................................4

## ATTACHMENTS

Attachment A:    Profile

Attachment B:    List of Documents

## 1.0 INTRODUCTION

This expert report regarding the Huth Oil site in Cleveland, Ohio was prepared by Peter Alvey, P.E., Principal Engineer of Roux Associates, Inc.  The expert report was prepared on behalf of Liberty Mutual Insurance Company for use in the action Liberty Mutual v. Black & Decker.

Opinions reached in this report are based on the following:

- Reports, maps, correspondence and other documents provided by counsel;

- Publicly available reports, maps, aerial photographs and other documents;

- The Expert Report of Peter Gerbasi, P.E. of Roux Associates, Inc., dated April 30, 1998, regarding the Huth Oil site;

- Mr. Alvey's professional experience in engineering and the remediation of contaminated sites.

As part of the upcoming trial, I expect to use various exhibits to assist in presenting my opinions.  I am planning to use site maps, aerial photos, excerpts from various documents, sampling data and tables.  Some of these exhibits can be found as attachments to Mr. Gerbasi's 1998 Expert Report, the remainder would be derived from information obtained from documents provided in the litigation as presented in the document lists attached to both this and the previous Expert Report.

Mr. Alvey's professional profile is found in Appendix A.  A listing of documents reviewed subsequent to the issuance of Mr. Gerbasi's 1998 expert report is found in Appendix B.  Mr. Alvey's billing rate for this project is $190 per hour.

## 2.0 SITE OVERVIEW

### 2.1 Site Description and History

The Huth Oil site is located at 2891-2913 East 83rd Street in Cleveland, Cuyahoga County, Ohio. The 2.5-acre site operated as a waste oil reclamation facility from 1938 to 1990. The site included over 30 storage tanks or tankers. The company accepted waste oil and other substances, which it blended for fuels and dust suppressants. Mr. George Huth oversaw operations until his death in 1990.

The site is not included on the Superfund NPL. Neither Black & Decker nor any of their predecessor companies owned or operated the Huth Oil facility. According to the Woodard & Curran report for Warner & Stackpole (December 1997), Black & Decker was named one of the approximately 250 Potentially Responsible Parties (PRPs). Evidence tying Black & Decker to the site reportedly consists of statements from two former employees regarding waste oil pickups, and a single document dated 1970. The time period of involvement is in the 1960's and/or 1970's. Black & Decker has no record of such an association.

### 2.2 Environmental Activities

A series of site investigations were conducted from 1983 to 1989 by USEPA and Ohio EPA which revealed contamination from PCBs. In September 1990, USEPA performed a Potential Hazardous Waste Site Preliminary Assessment.

In October 1990, USEPA issued a UAO under CERCLA to four PRPs which required removal actions to address PCBs and other hazardous substances (VOCs, metals). Response actions by Dames & Moore and Perland involved securing the site, removal of free standing oils, dismantling tank equipment, removal of soils and sludges, and installation of a surface cover were conducted from 1990 to 1992 on behalf of a PRP group.

A Closure Report was prepared by Dames and Moore (June 1993). This report contained information regarding the amount of oil and sludge waste disposed off site, soil sampling,

soil removal, confirmatory sampling, tank and pipeline demolition and disposal and site capping.

By 1994, the PRP group (Ashland Chemical, General Electric, Cleveland Electric Illuminating) claimed about $13.5 million was incurred for site cleanup, EPA oversight and PRP investigations. In May 1994, a settlement agreement was offered by the PRP group to other PRPs.

## 3.0 OPINIONS

Based on a review of the materials discussed in Section 1, Mr. Alvey provides the following opinions. The information provided in the additional documents obtained since the original 1998 expert report supports the opinions provided.

**Opinion 1.**   Certain environmental activities completed and/or proposed at the Huth Oil Site, including securing the site, removing, storing, and disposing of free standing oils, dismantling tank equipment and installing a surface cover over the Site are preventative and are not designed to remove or remediate environmental damages.

**Bases for Opinion 1.**

- The Administrative Order states that Work Plan 1 shall require " a.  Secure the Site by repairing all gaps in the fence surrounding the Site.  b.  Remove and properly store or dispose of all free standing oil in dikes; repair cracked or slumping dikes surrounding all above ground tanks which contain any liquids, and take necessary measures to prevent the release of liquids from the oil/water separator, the lagoon, dikes, or tanks."

- The USEPA Preliminary Assessment states "Many of the tanks and tankers at the Facility are severely corroded and are inadequately supported.  Several of the tanks are not contained within diked walls.  The tanks with diked areas have no liner or collection system in place to prevent infiltration to surrounding soils.  These inadequacies could eventually lead to groundwater contamination if not remedied."

**Opinion 1 References:**

United States Environmental Protection Agency Region V; October 5, 1990. Administrative Order

United State Environmental Protection Agency; September 5, 1990.  Potential Hazardous Waste Site Preliminary Assessment.

**Opinion 2.**   No elements of the Huth Oil Site remedies are associated with groundwater remediation.

## Bases for Opinion 2.

- The USEPA Preliminary Assessment states "Many of the tanks and tankers at the Facility are severely corroded and are inadequately supported. Several of the tanks are not contained within diked walls. The tanks with diked areas have no liner or collection system in place to prevent infiltration to surrounding soils. These inadequacies could eventually lead to groundwater contamination if not remedied."

## Opinion 2 Reference:

United State Environmental Protection Agency; September 5, 1990. Potential Hazardous Waste Site Preliminary Assessment.

**Opinion 3.**   Environmental activities completed and/or proposed at the Huth Oil Site, including securing the Site, removing, storing and disposing of free standing oils, dismantling tank equipment, removing and disposing of sludges contaminated with hazardous substances, and installing a surface cover are ordinary operational and closure requirements for owners of treatment, storage and disposal facilities.

## Bases for Opinion 3.

- Subpart J of the Hazardous Waste Regulations states "At closure of a tank system, the owner or operator must remove or decontaminate all waste residues, contaminated containment system components (liners, etc.), contaminated soils, and structures and equipment contaminated with waste, and manage them as hazardous waste..." (40 CFR Part 265.197)

- Subpart J of the Hazardous Waste Regulations states "A tank system or secondary containment system from which there has been a leak or spill, or which is unfit for use, must be removed from service immediately, and the owner or operator must satisfy the following requirements: (a) Cessation of use: prevent flow or addition of waste......(b) Removal of waste from tank system or secondary containment system.....(c) Containment of visible releases to the environment....(d)   Notifications,   reports.....(e)   Provision   of   secondary containment, repair, or closure...."

- The Proposed Hazardous Waste Rules (43 Federal Register 59012) states that upon final closure, all hazardous waste and hazardous waste residuals shall be removed from the surface impoundment. (December 18, 1978).

- Subpart K (Surface Impoundments) of the Hazardous Waste Regulations (40 CFR Part 265.228) states "At closure the owner or operator may elect to remove from the impoundment: (1) Standing liquids; (2) Waste and waste residues; (3) The liner, if any; and (4) Underlying and surrounding contaminated soil." The rule further states "If the owner or operator does not remove all the impoundment materials in paragraph (a) of this section, or does not make the demonstration in paragraph (b) of this section, he must close the impoundment and provide post-closure care as for a landfill under Subpart G..." (May 19, 1980).

- The Administrative Order states "The Site is an operating waste oil reclamation facility..." "The tank farm at the Site consists of 12 vertical tanks, 11 horizontal tanks, 5 compartmentalized, 2 buried tankers, and 3 underground storage tanks."

- The Administrative Order states that Work Plan 1 shall require " a.  Secure the Site by repairing all gaps in the fence surrounding the Site.  b.  Remove and properly store or dispose of all free standing oil in dikes; repair cracked or slumping dikes surrounding all above ground tanks which contain any liquids, and take necessary measures to prevent the release of liquids from the oil/water separator, the lagoon, dikes, or tanks."  In addition Work Plan 1 required  "c. Remove and properly treat or dispose of all liquids contaminated with PCBs or any other hazardous substance or hazardous waste."

- The Administrative Order states that Work Plan 2 shall include "Remove and properly dispose of all soil and sludge contaminated with PCBs or any other hazardous substance or hazardous waste."

- The Hazardous Waste Permit Application for the facility states the nature of the business is "transporting and storage of waste petroleum products, primarily lube oil".  The application lists tanks under storage and incineration under treatment

- The Notification of Hazardous Waste Activity form lists the type of hazardous waste activity as "c. Treat/store/dispose".

## Opinion 3 References:

United States Environmental Protection Agency Region V; October 5, 1990. Administrative Order

United States Environmental Protection Agency; November 21, 1990.  Hazardous Waste Permit Application.

United States Environmental Protection Agency; October 17, 1980.  Notification of Hazardous Waste Activity.

**Opinion 4.**  No elements of the Huth Oil Site remedies are associated with off-site cleanup.

**Bases for Opinion 4.**

- The September 5, 1990 USEPA Preliminary Assessment states "The sampling results reported by the Technical Assistance Team (TAT) indicate a localized PCB contamination problem within the property boundaries. Significant off-site migration or tracking does not appear to have occurred."

- The Fact Sheet states "The Order required the Respondents to perform removal actions to address the contamination by PCBs and other hazardous substances at the Site."

**Opinion 4 References:**

United State Environmental Protection Agency; September 5, 1990. Potential Hazardous Waste Site Preliminary Assessment.

-----; no date. Huth Oil Site Fact Sheet.

**Opinion 5**    Certain costs incurred, or likely to be incurred, at the Huth Oil facility are preventative and are not designed to remove or remediate environmental damages.

**Bases for Opinion 5.**

- The Administrative Order states that Work Plan 1 shall require " a. Secure the Site by repairing all gaps in the fence surrounding the Site. b. Remove and properly store or dispose of all free standing oil in dikes; repair cracked or slumping dikes surrounding all above ground tanks which contain any liquids, and take necessary measures to prevent the release of liquids from the oil/water separator, the lagoon, dikes, or tanks."

- The USEPA Preliminary Assessment states "Many of the tanks and tankers at the Facility are severely corroded and are inadequately supported. Several of the tanks are not contained within diked walls. The tanks with diked areas have no liner or collection system in place to prevent infiltration to surrounding soils. These inadequacies could eventually lead to groundwater contamination if not remedied."

**Opinion 5 References:**

United States Environmental Protection Agency Region V; October 5, 1990. Administrative Order

United State Environmental Protection Agency; September 5, 1990. Potential Hazardous Waste Site Preliminary Assessment.

# APPENDIX A

### Profile

**ROUX**                                                  **Professional Profile**

---

# Peter D. Alvey, P.E.
## Principal Engineer/Office Manager

---

**Technical Specialties:**
Management and oversight of remediation projects involving soil and ground-water contamination; remediation of chemical, petroleum, asbestos, and PCB contamination at factories, refineries, gas stations, hospitals, and commercial properties; performance of field activities, and selection/oversight of contractors.

**Experience Summary:**
Sixteen years in environmental assessment, remediation, and risk management; fourteen years in environmental claims investigation and management, including cost containment, liability assessment and settlement negotiations.

**Credentials:**
B.S. – Chemical Engineering – Rose-Hulman Institute of Technology, 1983
Registered Professional Engineer – Illinois
40-Hour OSHA Hazwoper Training
40-Hour Asbestos Inspector/Project Manager Training

**Professional Affiliations:**
American Institute of Chemical Engineers (AiCHE)
American Society of Testing Materials (ASTM)
Midwest Environment Claims Association (MECA)

**Key Projects:**
- Consulting expert for insurance carriers in settlement negotiations in claims related to over 300 individual manufactured gas plant sites nationwide, including several dozen in Illinois. Provided expert reports and assisted in settlement negotiations. Provided independent estimates of future costs analysis of potential natural resource damage claims and opinions on the appropriateness of past expenditures.

- Consulting expert for insurance carriers in settlement negotiations relating to over 40 landfills nationwide, approximately 10% of which were in Illinois. Provided expert reports and consultations regarding future remediation costs, timing of releases, quantification of natural resource damage claims and appropriateness of past expenditures.

- Expert witness for insurance carrier defense group in the litigation involving several New Jersey manufacturing facilities. Provided an expert report and deposition testimony regarding allocation of past costs to soil versus groundwater remediation, as well as allocation of remediation costs to first versus third-party claims.

- Expert witness for insurance carrier in litigation related to multiple Superfund sites located in the Midwest U.S. Provided expert report and affidavit regarding allocation of past expenditures to defense versus indemnity costs.

- Provided claims investigation services related to coal tar release to a navigable waterway in Chicago, Illinois. Conducted investigation into cause of release, specifically determining if release was due to an explosion or a mechanical failure. Provided cost containment services related to oversight of remediation activities.

- Provided claims investigation services related to a fire at a tire recycling facility in Illinois. Conducted an on-site investigation related to the cause of the fire, appropriateness of

response activities and allocation of costs to first versus third-party claims.

- Expert witness for insurance carrier defense group in litigation involving several mining facilities. Provided an expert report allocation past expenditures to various categories including; defense, investigation, remediation, closure and unrelated costs.

- Fact witness for insurance carrier in litigation involving a release of trichloroethylene by a tanker truck during a delivery at a manufacturing facility. Provided reports and deposition testimony relating to allocation of extent of contamination to pre-existing versus spill related conditions.

- Assisted insurance claims adjusters in handling of environmental claims in over 200 cases nationwide. Claims involved; UST releases, transportation related releases, heating oil claims and contamination at industrial facilitates. Provided assistance in hiring of remediation contractors, investigation of cause and origin and providing opinions regarding timing of releases.

**Project Management**
- Provided on-site management of decommissioning of steel manufacturing facility in Midwest. Activities included cleansing of PCB contaminated equipment and structural steel, design and operation of wastewater treatment system for remediation generated wastewaters and oversight of asbestos abatement activities.

- Provided on-site project management for decommissioning and demolition of manufacturing facility in the Midwest. Activities included removal of hazardous materials, UST removal, transformer removal, and asbestos abatement.

- Provided project management for UST program for mechanic contractor facilities nationwide. Responsibilities included hiring of tank removal contractors, negotiations with regulatory agencies and reimbursement from state UST funds.

- Completed PRP allocation project at Superfund site in Midwest for USEPA. Activities included review of waste-in documents including loading tickets and invoices. Determined PRP allocations based upon waste-in volume and toxicity of materials received.

- Performed environmental assessments of commercial and industrial facilities across the country in support of property transfers or mergers of companies.

- Conducted on-site investigations of over 200 industrial and waste management facilities nationwide in support of environmental liability insurance applications. Provided opinions related to the environmental risks posed by the facilities and prepared recommendations to reduce the potential liabilities.

- Project Manager for investigation and management of environmental insurance claims, including cost containment, liability assessment, and settlement negotiations. Investigation and remediation of chemical and petroleum contamination of soils and ground water.

- Environmental Manager of a team of professionals in environmental claims investigations, liability assessments, and remediation projects. Specific projects included refinery

M

**Professional Profile**

# Peter D. Alvey, P.E.
## Principal Engineer/Office Manager

waste remediation, underground storage tank removal, Phase I and II real estate assessment, and liability assessments of industrial facilities.

- Chemical Engineer responsible for field activities relating to remediation of soil, ground water, and asbestos contamination of industrial facilities. Specific projects included decommissioning/decontamination of industrial facilities, SPCC (spill prevention control and contingency) plan preparation, and design/implementation of site investigations.

- Chemical Engineer responsible for chemical and material analysis for metal finishing industry clients. Specific projects included waste minimization studies, waste water treatment design, process control, and corrosion studies.

- Piping Engineer working at nuclear power plants in Illinois and Indiana as a piping and pipe support as-built engineer. Responsible for survey and redesign of pipe systems and pipe supports for both nuclear and non-nuclear related piping.

**Expert Witness Testimony  (last four years):**

- Curtiss-Wright Corporation V. Aetna (1998)
  Superior Court of New Jersey (Bergen County)
  Expert Report and Deposition, settled prior to trial

- Central Maine Power v. Earnest A Moore (1999)
  Superior Court of Maine (Augusta)
  Expert Report and Deposition, settled prior to trial

- Consumers Energy Company v. Certain Underwriters at
  Lloyd's London, et al  (2000)
  U.S. District Court Eastern District of Michigan
  Expert Report and Deposition, testimony at binding arbitration

- Crucible Materials Corporation v. Aetna (2000)
  Federal Court (Northern District of New York)
  Expert Report, Deposition

- Jostens, Inc. v. Federated Mutual Insurance Co., et al. (2001)
  Ramsey County (MN) District Court
  Expert Report, Deposition, settled prior to trial

M